IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 7, 2005 Session

## KEVIN B. BURNS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County
No. P-21820 James C. Beasley, Jr., Judge**

**No. W2004-00914-CCA-R3-PD - Filed December 21, 2005**

The petitioner, Kevin B. Burns, appeals the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief. He was convicted of two counts of felony murder and two counts of attempted felony murder and sentenced to death on one count of felony murder and to life imprisonment on the second count of felony murder. His convictions and sentences for first degree felony murder, including the sentence of death, were affirmed on direct appeal by the Tennessee Supreme Court. See State v. Burns, 979 S.W.2d 276 (Tenn. 1998). However, this court reversed the attempted felony murder convictions and sentences, finding these convictions did not constitute a crime in this state. See State v. Kevin Burns, No. 02C01-9605-CR-00170, 1997 WL 418492, at *9 (Tenn. Crim. App., at Jackson, July 25, 1997), aff'd, 979 S.W.2d 276 (Tenn. 1998). The *pro se* petition for post-conviction relief resulted in the appointment of counsel and the filing of two amended petitions. An evidentiary hearing was conducted, and the post-conviction court denied the petitions. On appeal, the petitioner presents a number of claims in four broad categories: (1) he was denied a fair post-conviction evidentiary hearing; (2) he was denied due process; (3) trial counsel were ineffective; and (4) the imposition of the death penalty is unconstitutional. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, J.J., joined.

Donald E. Dawson and Marjorie Bristol, Nashville, Tennessee, for the appellant, Kevin B. Burns.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michelle Chapman McIntire, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The proof, as set forth in our supreme court's decision, established the following:

On April 20, 1992, four young men, Damond Dawson, Tracey Johnson, Eric Thomas, and Tommie Blackman, were sitting in a car in Dawson's driveway in Memphis. Dawson was in the driver's seat, Johnson was in the front passenger seat, Thomas was in the back seat behind Dawson, and Blackman was in the back seat behind Johnson.

The [petitioner] and Carlito Adams, who knew Blackman, walked up to the passenger side of the car. Adams pulled out a handgun and told Blackman to get out of the car. When Blackman refused, Burns pulled out a handgun and went around to the driver's side of the car. Blackman got out of the car and fled. Adams said "get him," and three or four more men appeared from behind hedges and fired at Blackman.

Eric Jones, age fourteen, was playing basketball at Dawson's house with three friends. Jones saw the men in the car removing jewelry and pulling money from their pockets. Seconds later, Jones saw Blackman running toward him. Amidst gunshots, Jones and Blackman escaped to the back of the house; Jones' three friends ran to an adjacent yard. Once inside the house, Jones heard seven or eight more gunshots.

Mary Jones, Eric Jones' mother, lived across the street from the Dawsons. She saw Adams shoot Johnson once in the chest. She saw Kevin Burns shoot Dawson several times, walk to the front of the car, and then shoot Dawson again. Ms. Jones unequivocally identified Burns and stated that she got "a real good look in his face" as he ran toward her after the shootings.

Tracey Johnson died at the scene. Damond Dawson, who suffered five gunshots to his arm, buttocks, chest, and hip was alive when police arrived but died after being transported to the hospital. Eric Thomas, who sustained gunshots to his chest and stomach, survived and made a photo identification of Kevin Burns two days after the incident. Thomas testified that Burns and the others had "opened fire" after robbing him and his friends of their jewelry and money. Thomas said that he initially told police he had been shot by Adams, but explained that he believed he was going to die and gave police the only name he knew, which was Adams.

On June 23, 1992, [the petitioner] was found in Chicago and arrested. After being advised of his rights and signing a waiver, the [petitioner] gave a statement in which he admitted his role in the killings. He said that he had received a telephone call from Kevin Shaw, who told him that four men had "jumped" Shaw's cousin. Burns, Shaw, and four others intended to fight the four men, and Shaw gave Burns a .32 caliber handgun. As the others approached a car with four men sitting in it,

2

Burns stayed behind. He heard a shot, saw a man running across the yard, and fired three shots. He then left the scene with the other men.

After the guilt phase of the trial, the jury deliberated and returned verdicts of guilty for two counts of felony murder and two counts of attempted felony murder. The trial moved into the penalty phase of the proceedings for the jury to determine the punishment for each of the felony murder convictions.

. . . .

Jonnie Dawson, mother of Damond Dawson, testified that Damond was the youngest of her three children and seventeen years of age when he was killed. She said he was a good son who was very good at athletics. The neighborhood had changed after the killings; people locked their doors and were afraid. Ms. Dawson testified that she no longer knew what it was like to be happy.

Brenda Hudson, mother of Tracey Johnson, testified that Tracey was the oldest of her three children and twenty years of age when he was killed. He had been working at Wal-Mart and saving money for his four-month-old daughter. Tracey's death had greatly affected Ms. Hudson' other two children, Tracey's grandfather, and Tracey's young daughter:

> When you go over to her house to see her, she has a picture in a frame and she will show you. She'll say, "this is my father--this is my daddy, Tracey. He lives in God's house up in heaven."  And it's hard for me to go see her a lot because it breaks my heart to hear her say that.

In mitigation, Leslie Burns, the [petitioner's] mother, testified that the [petitioner] was twenty-six years of age and had twelve brothers and sisters. He had graduated from high school and presented no disciplinary problems while in school. The [petitioner's] father, Reverend Obra Carter, testified that his son had always been obedient and well-mannered. Phillip Carter, the [petitioner's] brother, testified that the [petitioner] had been active in the church and had always tried to avoid trouble.

Norman McDonald, the [petitioner's] Sunday School teacher, testified that he had known Kevin Burns for several years. According to McDonald, Burns was a "faithful" young man who had always attended church regularly. Mary Wilson, a Captain with the Shelby County Sheriff's Department, and Bennet Dean, a volunteer chaplain, both testified that Burns had actively participated in religious services while in custody for these offenses.

The prosecution relied on two aggravating circumstances to seek the death

3

penalty for the felony murder convictions--that the [petitioner] knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder, and that the murder had been committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. § 39-13-204(i)(3) and (6) (1997 & Supp. 1998). With regard to the felony murder of Damond Dawson, the jury imposed the death penalty after finding that the evidence supported the "great risk of death" aggravating circumstance and that this factor outweighed the evidence of mitigating factors beyond a reasonable doubt. With regard to the felony murder of Tracey Johnson, the jury imposed a sentence of life imprisonment.

The trial court entered judgment in accordance with the jury's verdict. The Court of Criminal Appeals affirmed the convictions and sentences for the offenses of felony murder, but reversed the convictions for attempted felony murder based on our opinion in State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996). After our review of the record and applicable authority, we affirm the Court of Criminal Appeals.

Burns, 979 S.W.2d at 278-79 (footnote omitted).

## POST-CONVICTION HEARING

Harold Archibald, a Shelby County attorney, testified that he and Clim Madlock, Jr., were appointed to represent the petitioner at trial. Their representation lasted for a period of approximately seven months, during which time Archibald filed various motions requesting the assistance of experts, including ballistic experts, sociologists, psychologists, and drug-addiction experts. Archibald acknowledged that most of these motions were filed in anticipation of presenting proof during the penalty phase of the trial. Archibald and Madlock eventually withdrew as counsel when Madlock discovered that he knew some family members of one of the victims. The petitioner and his mother were informed of Madlock's acquaintances, and "the mother decided that she didn't want [Madlock and Archibald] on the case any more." Senior and junior trial counsel succeeded Archibald and Madlock as counsel of record. Archibald could not remember if he ever met with successor counsel or provided them with a copy of his file.

Archibald stated that, during the course of his representation, he met with the petitioner several times in jail to inquire about his family and background, specifically his educational background. Counsel learned that the petitioner graduated from West Memphis Senior High School in 1987 as an honor student and, later, attended Arkansas State University for half a semester. After leaving college, the petitioner remained in Jonesboro, where he worked at a Shoney's restaurant. The petitioner told Archibald that he also had worked at two restaurants in West Memphis and one in Memphis and as a carpenter for a construction company. Counsel asked the petitioner about his medical history, school activities, drug or alcohol use, and prior criminal convictions. The petitioner responded that he had suffered a broken arm, had no conduct problems while in school, had prior convictions for burglary and theft of property, had not used drugs, and had drunk beer on the date

4

of the incident. Archibald said he would have sought further evaluation had the petitioner indicated that he had a drug or alcohol problem.

Archibald negotiated an offer on behalf of the petitioner for a sentence of life imprisonment, conveyed the offer to the petitioner, and explained the meaning of a sentence of life imprisonment. Archibald further explained to the petitioner that he had the option of going to trial but that the State would seek the death penalty. However, the petitioner elected not to accept the State's offer.

During the course of his representation of the petitioner, Clim Madlock, Jr., learned that he lived across the street from members of one of the victim's family and also knew the victim. Madlock immediately told co-counsel and they informed the petitioner who requested that they talk to his mother and allow her to make the decision as to their continued representation. Madlock stated that the petitioner's mother did not want them to remain as counsel and, ultimately, they withdrew from the case.

Madlock testified that he and Archibald had filed motions requesting expert assistance but had withdrawn as counsel prior to the actual hiring of any experts. Madlock said that he "never heard anything about" the petitioner's having a drug or alcohol problem and that a mental evaluation was conducted out of an abundance of caution. The results of the evaluation showed that the petitioner was competent and that an insanity plea could not be supported.

After the petitioner's first counsel were relieved, senior and junior trial counsel were appointed as successor counsel. At the time of his appointment, senior counsel was in private practice, which was "ninety-five percent criminal." Prior to entering private practice, senior counsel had been a prosecutor in Shelby County for nine years, during which he handled as many as fifty capital cases and proceeded to trial in about twenty-five. He had been appointed in as many twenty-five capital cases, with approximately ten going to trial. Senior counsel said that only two of these cases, one of which was the petitioner's, resulted in conviction. He could not recall attending any capital case exclusive seminars, although he had attended seminars sponsored by the Tennessee Bar Association or the local bar association that dealt with criminal law, including capital representation. He said that he had reviewed the Tennessee capital case manual produced by the Tennessee Association of Criminal Defense Lawyers.

Senior counsel testified that he and junior counsel shared equal responsibility for the entire case "up until trial, and then [at] some point [they] divided the witnesses that [they] would handle for trial both for the guilt and then for the sentencing stage." Senior counsel explained that sometimes they both met with the petitioner and, on other occasions, either he or junior counsel visited the petitioner alone. Senior counsel said he met with Archibald and Madlock on four or five occasions and they provided him with copies of the motions they had filed.

Senior counsel could not recall filing any additional pretrial motions other than the request for a private investigator, which was granted, resulting in his retaining Curtis Mull, a retired police officer. Having employed him on numerous occasions, senior counsel related that it was Mull's

5

practice to interview all of the witnesses identified on the back of the indictment and from the State's list of witnesses. He recalled that although Mull had difficulty finding some of the witnesses, Mull was able to obtain "copies of the state's file. . ., [*i.e.,*] copies of all the witnesses' statements and all the state's files that [counsel thought] existed at the time." Mull attempted to talk with the other participants but encountered difficulty. Senior counsel said that, in his opinion, Kevin Shaw should have been charged but that he never inquired as to why Shaw was not charged because the petitioner admitted he had a weapon and one of the participants had implicated the petitioner as the trigger man.

Senior counsel said that he visited the crime scene on at least two occasions and "put the car where the cars were, that type of thing, and the way they were supposed to have left, the way they [sic] supposed to have arrived, and the witnesses' angles to see, just general-type crime scene investigation. . . ." He also conducted a "door to door deal that is we go to the crime scene, and we'd go up and down the street knocking on doors . . . to see anybody the police missed for instance, who may have seen something about the crime." Senior counsel said that the "door to door" was unsuccessful, as were his attempts to talk to Mary Jones and Tommie Blackman.

Senior counsel was able to convince the State not to try the petitioner first, and, in fact, he was tried last. Counsel said this was an important strategy because it allowed counsel to observe the witnesses in person and see what they were going to say under oath. Senior and junior counsel attended the first and second trials and obtained transcripts of both. Senior counsel said they "spent a considerable time in preparation for trial with [the petitioner] in term[s] [of] what [their] defense would be and in terms of trying to prepare him for trial and testify and that type of thing."

As to preparing a defense for the charges, senior counsel acknowledged that the petitioner had given a statement to the Federal Bureau of Investigation ("FBI") admitting that he was present at the scene and that he had a weapon and fired shots, this statement significantly limiting defense options. The defense was that the petitioner was a participant, but not the trigger man, and that he did not fire into the victims' car. In this regard, senior and junior counsel discussed obtaining a ballistics expert and requested funds from the trial court. However, after further discussion, counsel decided that a ballistics expert was not needed. Senior counsel said that establishing the petitioner's defense was difficult, in particular, because "nine out of ten people said he was the trigger person." Thus, the best proof that the petitioner was not the trigger person was going to come from the petitioner himself.

In formulating a mitigation strategy, counsel requested that the investigator contact approximately twelve friends, neighbors, teachers, and co-workers of the petitioner to testify on his behalf. Subpoenas were issued for Captain Mary Wilson, Officer Love, and Officer Walker, all employees at the Shelby County Jail. Senior counsel said that a teacher, two coaches, a minister, and a co-worker of the petitioner's, all from West Memphis, were subpoenaed. He said that he did not recall interviewing any witnesses in person and, if he spoke to any of them, it was by telephone. His recollection was that the witnesses were interviewed by their investigator. Of the witnesses subpoenaed, Captain Wilson, Bennett Dean, and Norman McDonald testified at the penalty phase.

6

Senior counsel explained that twelve individuals appeared on the petitioner's behalf but, after talking to these people, counsel, with the consent of the petitioner and his parents, made a decision as to which witnesses to use.

Senior counsel recalled that the length of the petitioner's hair at the time of the crime was an issue, one eyewitness having described the shooter as having a "jheri curl hair style that was rather lengthy." Specifically, Mary Jones said that the person who shot Damond Dawson was a "[r]eal dark man with a jheri curl . . . around five-seven or five-eight, medium build . . . in [his] late twenties." Counsel acknowledged that the petitioner had told him that he did not have a jheri curl at the time of the crime but, instead, had a "regular hair cut." However, the petitioner was unable to provide counsel with any witnesses to verify that he had "a normal haircut at the time that this incident occurred." Counsel said that not even the petitioner's parents would testify that the petitioner had a short haircut at the time of the incident. Moreover, the eyewitness could not identify the petitioner from a mugshot in which he had short hair, although she identified him at trial while he had a longer hairstyle. While the petitioner did provide counsel with a photograph of himself "with short hair, or a nonjheri curl hair, . . . that photograph appeared to be of a much younger Kevin Burns and not Kevin Burns at the time of this incident." Senior counsel testified that, at the time of his initial meeting with the petitioner, the petitioner had a "jheri curl style hair, and it was long. . . ." He added that this "aggravated" him and that he attempted to persuade the petitioner to change his hairstyle for trial, but the petitioner refused to do so.

Senior counsel testified that he had maintained his files on the petitioner and, in 1999, had provided investigators with the post-conviction defender's office access to his case file. Although not accusing anyone of wrongdoing, counsel said that items were missing from his file that he knew were in the file prior to 1999. Specifically, it contained the transcripts from the trials of co-defendants Derrick Garrin and Carlito Adams.

Senior counsel said that he reviewed the transcripts of codefendant Garrin's trial prior to the petitioner's trial. During Garrin's trial, victim Eric Thomas identified Garrin as the individual who shot him and Damond Dawson, but, at the petitioner's trial, Thomas identified the petitioner as the individual who shot him. At Garrin's trial, Thomas described codefendant Carlito Adams "as being five-seven or five-eight and 170 pounds" and the other perpetrator as "[f]ive-eight, slim build, dark complexion, curl-like fade." In counsel's opinion, the other perpetrator's description matched the petitioner. Counsel acknowledged there was not "one hundred percent consistency among the witnesses and victims as to each role each player position [sic] around the car. They were mostly consistent in that [the petitioner] was not generally considered to be one of the first two people to arrive at the car, but I read that to mean when he gave that description because it didn't fit the description of somebody else, that that's who he was talking about."

Senior counsel was also questioned about the statement of codefendant Carlito Adams. In his statement, Adams said he only knew two of the people he was with that day, Kevin Shaw and Benny Buckner. Accordingly, the inference could be made that when Adams referred to "Kevin," he meant Kevin Shaw and not the petitioner. Counsel agreed with post-conviction counsel that

7

Adams' statement, in connection with Eric Thomas' statement at codefendant Garrin's trial, would place Kevin Shaw, not the petitioner, alongside Adams at the onset of the incident. Counsel explained that he did not use that assumption to argue that the petitioner was not this person, because Adams also "talk[ed] about the two individuals he [didn't] know . . . as being the shooters."

Senior counsel explained his understanding of "presentation of mitigation" as "those factors that are enumerated in the statute in terms of presenting them and the defendant's case whether it be his age, his – any kind of mental problems, his role as a leader, or amount of participation in the crime involved, and thus his family history, society history . . . educational background, work history." He acknowledged that he had never used the services of a mitigation specialist and that the function of such a witness was to perform the "background preparation."

Regarding mitigation investigation in the petitioner's case, senior counsel stated that only the services of Mr. Mull were employed. Although counsel could not recall the specific number of hours of work performed by Mull, he recalled that Mull was also the investigator in codefendant Garrin's case. Asked about one invoice representing that Mull performed eight hours of work, counsel said he would be surprised if "this was the only one." Counsel did not direct Mull to investigate the culture of West Memphis or the neighborhood where the petitioner grew up. He acknowledged that he did not know that the petitioner's backyard was connected to "one set of projects in West Memphis" or that gunshots had been fired into the petitioner's house. Counsel said that the petitioner's parents, Leslie Burns and Obra Carter, were divorced and that counsel attempted to interview the petitioner's siblings.

Post-conviction counsel then inquired as to the voir dire process. Archibald had filed a motion for individual voir dire which was denied. Senior counsel explained that "the standard policy . . . in Shelby County is that it's denied unless you begin to pick the jury and find that because of some pretrial publicity, individual voir dire may be warranted." He did not believe individual voir dire was requested to ascertain "people's views on the death penalty." In preparing for voir dire, senior counsel explained there were "standard questions that [counsel] try to ask in capital cases." He said they requested a jury list of the potential jurors "to get an idea of who they were, where they worked, their background, that type of thing."

Following the petitioner's convictions, trial counsel presented nine issues for appellate review. Although the proportionality of the petitioner's death sentence compared to the general death sentence population was made, counsel did not argue the proportionality of the sentence compared to the sentences received by the petitioner's codefendants. Senior counsel said he believed that, although the issue was not raised, this court addressed the issue *sua sponte*. Counsel also challenged the constitutionality of Tennessee's death penalty statutes, although failing to raise the specific challenges to the unbridled discretion of the prosecutor that the death penalty statute violates the right to life. He acknowledged that a challenge to the denial of individual voir dire was not made. Senior counsel said he spent 218.9 hours on the petitioner's appeal.

On cross-examination, senior counsel acknowledged that the petitioner's statements placing

him at the scene eliminated any use of an alibi defense, the statement being "that he was there, and that he was shooting at one of the victims, but he didn't hit the victim." Counsel added that the codefendants, with the exception of Garrin, "said that [the petitioner] was the trigger person." Codefendant Garrin said he saw the petitioner take jewelry from one of the victims. Counsel recalled that an unindicted participant, Benny Buckner, testified at codefendant Adams' trial. During that trial, the trial judge had Buckner arrested and charged with facilitation. Counsel did not believe that the petitioner was less culpable because additional people were involved.

Senior counsel acknowledged there was some difficulty in his relationship with the petitioner, resulting from the petitioner's refusal to change his hairstyle for the trial and rejection of what counsel believed to be an "extraordinary offer by the [S]tate . . . to offer a bench trial [on both the guilt and penalty phase]." Counsel was astounded by the offer because "[the trial judge] had a history of being opposed to the death penalty as a trial lawyer, and I mean adamantly opposed to the death penalty." He attempted to persuade the petitioner that this was a good option as, even if they lost at the guilty phase, it was unlikely that the trial judge would impose the death penalty since the two codefendants had received life sentences. Acting upon the advice of his mother, the petitioner rejected the offer. Counsel said that the petitioner relied more upon his mother's advice than that of experienced counsel. In this regard, counsel recalled that the petitioner's mother had told him that he had made up the fact that the petitioner had received property from the robbery. After this incident, the petitioner refused to discuss the facts of the case with counsel.

Senior counsel said that the petitioner was deemed to be the most important witness of the defense because he was adamant that the did not kill the victims and the jury needed to hear this testimony. The petitioner's testimony was essential, given the limited nature of the defense. Accordingly, counsel expected the petitioner to testify. However, at some point during the trial, the petitioner informed counsel that he had changed his mind about testifying. This decision of the petitioner had a great impact on counsel's trial strategy in that it removed a significant part of the defense. Counsel explained that he felt the reason they were proceeding to trial was for the petitioner to testify, *i.e.*, "[h]e wanted his day in court to tell that jury what happened out there." Counsel could not say, in hindsight, what he would have done differently to prepare for trial had he known that the petitioner would ultimately refuse to testify.

Regarding mitigation evidence, counsel testified that the witnesses chosen to testify were those "who could say the most positive things about [the petitioner]." Counsel recalled that the petitioner's father was a minister and the petitioner was involved in the church. Mitigation witnesses were limited, however, to prevent cross-examination by the State into the prior criminal record of the petitioner. Counsel added that the petitioner's mother had instructed certain potential witnesses not to come to trial, specifically a next-door neighbor and perhaps someone from a school. The petitioner told counsel he agreed with his mother's decision. Counsel said that the petitioner's parents provided no indication that the petitioner had anything but a normal childhood and disagreed that a housing project located behind the petitioner's childhood home would have been worthwhile as mitigating evidence. Counsel said the petitioner never told him he had been shot; indeed, the only information of any injury to the petitioner was a broken arm. Questioned as to the proper amount

9

of mitigation proof to present, counsel responded, "I think you can offend the jury with the proof that you put on a case such as this. You have to be careful what you do put on, and I have seen the juries offended with the proof that was presented to them."

Regarding counsel's planned trial strategy and handling of the case, senior counsel stated that the petitioner "had input on everything we did. Everything we did we ran by him. We got his approval or disapproval." Counsel could not recall any witness that he did not call that the petitioner wanted to testify. He did not call any of the codefendants as witnesses, for the only purpose of such testimony would have been to reveal their sentences, and counsel expected the State would have objected to this testimony. He opined that any inconsistencies between the testimony in the different trials would not have changed the fact that the petitioner was involved in the crime. He noted that the jury deliberated for two days on the guilt phase and for two days on the penalty phase.

Senior counsel said there was no indication that the petitioner had any mental problem or mental illness from the mental evaluation performed by Midtown Mental Health Center, from his family, or from his school history. Counsel said had anything been discovered that would have questioned the petitioner's mental condition, he would have sought additional assistance from the court. He rejected the idea that the petitioner did not understand the nature and consequences of his offenses. Rather, he stated that the petitioner understood the decisions to be made but refused to follow counsel's recommendations.

The post-conviction court then questioned counsel regarding the murder weapons. Counsel's recollection was that the murder weapons were not introduced during the petitioner's trial. The two weapons recovered from codefendant Garrin's porch were determined to be the murder weapons, one used to kill each victim. However, no testimony was introduced linking either weapon to the petitioner. Accordingly, counsel believed that a ballistics expert was not necessary.

Junior counsel testified that he had been a practicing attorney since 1981 and was appointed to represent the petitioner in April 1993. He had worked as a public defender but at the time of his appointment was in private practice, the vast majority of which was criminal. Prior to his appointment to represent the petitioner, junior counsel had represented capital defendants, although he could not recall how many. He said that he had attended capital defense seminars presented by the Capital Case Resource Center and a three-day seminar in Atlanta that dealt exclusively with capital representation. He had a three-volume set of the Tennessee Capital Case Defense Manual and had consulted numerous books and references involving capital defense. He stated that he was familiar with the ABA standards for the appointment and performance of attorneys in capital cases.

Junior counsel recalled that a motion for individual voir dire was filed but was denied. Regarding the petitioner's trial, counsel stated that questions were asked to learn the potential jurors' views about the death penalty. No questions were asked to determine whether a juror would automatically impose death and not even consider a life sentence. Counsel clarified this statement, stating that he "would not ask a juror during voir dire about considering a life sentence because what that does is tell the jury that your client is already guilty all you're seeking is life." He stated that

he and senior counsel had discussed the type of juror they hoped to have on the jury.

The theory of defense rested mainly upon the petitioner, specifically, his assertions that he had fired into the ground or the air, that he did not know the victims, and that he was not culpable. In this regard, a focus of the defense was to challenge the identification of the petitioner by the eyewitnesses. Junior counsel recalled that, during the petitioner's trial, victim Eric Thomas identified the petitioner as the individual who shot him. Counsel attempted to impeach Eric Thomas' identification by use of Thomas' statement to police identifying Carlito Adams as the shooter. Thomas explained that he gave Adams' name because that was the only name he knew. During the trial of codefendant Garrin, Thomas described the person who walked up to the car with Adams as "tall, probably five-eight, slim built, dark complexion, curl-like fade." Counsel acknowledged the discrepancies in the testimony was a focus during their preparation. Counsel also noted that a problem during preparation and trial was that witnesses confused the petitioner and Kevin Shaw. Counsel identified Kevin Shaw's statement, which listed Shaw's address and telephone number, and acknowledged that Shaw's telephone number matched the telephone number for "Kevin" given by Adams in his statement. Based upon Adams' statement, counsel agreed it would be "a fair assumption" that Adams was referring to Kevin Shaw when he said "Kevin and I walked up to [the victims'] car."

Junior counsel asserted that the petitioner's refusal to testify was devastating to the defense, explaining that his testimony, although an admission to participation in the offenses, would have established that his involvement was not significant enough to "get him the death penalty." Although the petitioner's testimony would have been sufficient to support a conviction for felony murder, the defense strategy was to show him as less culpable than the other participants. Counsel acknowledged that most of this information came in through the admission of the petitioner's statement to the FBI.

Junior counsel described their penalty phase defense as "[v]ery weak." Counsel had evidence that the petitioner "was in fact a good person" but were prevented from introducing the testimony of some witnesses because it was cumulative. He stated there "was a coach from the high school . . . another couple of family members that we were able to get to testify." Despite these witnesses testifying that the petitioner was a good person, his prior record established that he was not.

Junior counsel said that five mitigation witnesses were presented: Elder Norman McDonald, a pastor who had known the petitioner his entire life; Mary Wilson, a captain at the Shelby County Jail; Bennett Dean, a pastor at the jail; Elder Phillip Carter, the petitioner's half-brother; the petitioner's mother; and the petitioner's father. Counsel stated that the plan was to present (1) "good-guy" mitigation evidence and (2) a picture that the petitioner did not deserve the death penalty. Counsel wanted to establish that the petitioner had a good childhood and that there was no reason for him to be involved in this situation. Counsel said the petitioner's mother prevented certain mitigation evidence from being introduced, explaining that she "basically controlled this case as far as whether or not people would talk to us, and during the negotiations and talking to her and talking to his dad at one point it got to the point that she didn't want anybody, any family members

11

or anybody from West Memphis to anything do [sic] with us at all period." He said her actions prevented them from being able to use people from the petitioner's community who knew him as a child. Junior counsel acknowledged they did not conduct an investigation into the culture of West Memphis, Arkansas, explaining that West Memphis was "just across the river" and "not that much different" from Memphis.

Junior counsel related that the petitioner's father was a minister and "relatively strict on him in regards to what he could do and what he could not do." However, his father had a separate family with another woman that he raised alongside the petitioner's family. That is, the petitioner's father had "two sets of children all about the same age, two different women . . . that he was taking care of and all right there in West Memphis." Counsel found this peculiar but not to the extent that it created mitigation evidence. Although his father played a role in his life, the petitioner was more influenced by his mother. Counsel recalled that the neighborhood in which the petitioner was raised was not a violent neighborhood. While counsel acknowledged that information that shots had been fired at the petitioner's house might have been useful in mitigation, counsel had no information that a shooting had ever occurred.

Asked about the nature of the work of a mitigation specialist, junior counsel responded:

They go out and they dig up every conceivable record of an individual's past, from birth to dropping on heads to being deprived of oxygen up until the actual day of trial, and that's [what] the mitigation specialist does, and they accumulate a vast volume of information that really has – carries very little or no weight.

He acknowledged that mitigation specialists have some degree of expertise in interviewing people in the community about someone's background.

Junior counsel recalled that, while incarcerated prior to trial, the petitioner had been "converted" and believed that "the Lord would take care of him that all would be fine and well that he had prayed." Counsel stated that the petitioner "was not . . . any kind of religious fanatic."

Junior counsel explained that, in preparing this case, counsel had problems communicating with the petitioner's family, saying "[i]t was like the proverbial run into a brick wall." Certain family members refused to cooperate with counsel. Despite counsel's explaining the seriousness of the charges and the circumstances of the offenses to the petitioner's mother, she was adamant in her belief that he "had not done anything that he was totally innocent that we were the people . . . trying to do something to him or trying to hurt him or whatever, and she just basically shut down." During their investigation, senior and junior counsel learned that the petitioner and his mother were very close and that she had "assisted him in that little trip to Chicago evading arrest."

From the onset, the petitioner was involved in creating a mitigation strategy and even informed counsel of potential witnesses. Junior counsel added that several potential witnesses refused to testify because either they did not want to be bothered or did not remember the petitioner

12

as well as the petitioner thought they did. Counsel felt that it was bad practice to compel a witness to provide mitigation evidence. Several witnesses were present and ready during the penalty phase to give mitigation evidence but were not called out of caution that their testimony would open the door to the petitioner's prior West Memphis convictions and would have merely been cumulative to the other testimony already presented.

Junior counsel again stated that there was no indication whatsoever that the petitioner suffered from any mental or personality defects. His family had informed counsel that the petitioner had a decent childhood, knew both of his parents, attended school, and had food and clothing. From every indication, the petitioner was "very normal."

Junior counsel explained counsel's efforts to convince the petitioner to adopt a different hairstyle before trial. He stated that the petitioner had a "pretty long" "jheri curl" when he first met him. During the initial investigation, counsel discovered that one eyewitness identified the shooter as having a "jheri curl" and that "out of all the [participants] . . . nobody else had a jheri curl except [the petitioner]." Counsel was unable to locate any witness that would testify that the petitioner had short hair at the time of the incident.

Junior counsel argued the appeal of the case to both this court and the supreme court. He raised the issues that he felt had weight and that they might "get some relief on." He felt it unnecessary to "bog the court down with peripheral issues when if I can key in on something that may allow [the petitioner] to walk or go home, that's what I'm going to do." Counsel stated that he was successful on some grounds on appeal, for instance, the introduction of certain victim impact evidence. Additionally, the petitioner's two convictions for attempted felony murder were reversed.

Junior counsel said that he had never heard of Kevin Whitaker. He did know that, at the time of the incident, the petitioner was involved in rap music. Many questions were asked of the petitioner related to rap music, but Kevin Whitaker's name was never mentioned.

Mary Jones testified that she lived across from the Dawsons' residence and that she testified at the petitioner's trial, where she described the man she saw shoot Damond Dawson as having shoulder-length jheri curl hair and wearing a long, black trench coat. She also saw the man who shot Tracey Johnson and described him as "a brown-skinned guy, tall, . . . about six-two, six-three, weighed about 250 pounds." Johnson's assailant was the "largest one" in relation to the other people she saw around the victims' car. Ms. Jones identified the petitioner as the assailant sporting the "[s]houlder length jheri curl."

Kevin Whitaker, a pastor at Mount Episcopal Baptist Church in Crawford, Arkansas, testified that he had known the petitioner for approximately sixteen years. In 1990, they, along with Derrick Garrin, were in a rap band known as S.I.R., Superior Illustrated Rappers. Whitaker also had a record company at that time called Unlimited Phonic Records. Whitaker knew Kevin Shaw and Benny Buckner, who were in a rap band called Brothers of the New World. Whitaker introduced the petitioner and Kevin Shaw. Kevin Shaw's father helped finance Mr. Whitaker's record company.

13

On April 20, 1992, Whitaker received a telephone call from Kevin Shaw, asking him to accompany Shaw and Carlito Adams to Memphis to help him "tak[e] care of some people that he was having a problem with." Whitaker did not go because he knew that "[Shaw] was kind of shady . . . I didn't trust going nowhere [sic] with him at that time." Whitaker recalled that in April 1992, Shaw wore his hair "kind of like a high top, kind of like a high-top fade type of deal" and often wore a trench coat. Whitaker thought Benny Buckner also wore a trench coat because that "was like the nature of their group the way they dressed and everything." According to Whitaker, Buckner had the same hairstyle as Shaw. Questioned about the petitioner's hairstyle in April 1992, Whitaker responded that his hairstyle was "[l]ike mine is now," "low on the scalp." He said that, during April 1992, the band S.I.R. was in the process of changing its name to H.O.H., and no member of S.I.R. or H.O.H. ever wore trench coats as part of the band costume.

Upon questioning by the post-conviction court, Whitaker stated he knew that two members of his band, the petitioner and Garrin, were indicted for murder. He said he had been available and would have testified at the petitioner's trial if asked.

Lloyd Davis was the jury foreman in the petitioner's 1995 trial and, during the course of his service, had a Bible in his possession. He testified that, during jury deliberations, he recited a verse from Isaiah "about God was telling that his thoughts were not our thoughts, and his ways were not our ways." He explained that he recited the verse because "there was some indecision on the parts of a juror, and she just said . . . something about God wouldn't . . . allow her to make her decision to give somebody the death penalty or something like that."

The petitioner was a student in Arlee Bruce's senior English class at West Memphis High School, and Ms. Bruce testified that the petitioner was never a disciplinary problem and was always "mannerly" and "very respectful." She could not recall a time when he was punished with in-school suspension. She said that the petitioner and a fellow student, Paul Burks, "were always together," and she considered the two of them to be "model students." She said the petitioner "made good grades."

Samuel G. Brooks testified that he went to school with the petitioner and played junior high football with him. After graduating from high school in 1987, Brooks entered the military but remained friends with the petitioner, visiting him when he was home on leave. He described the petitioner as one of his "main friends." Brooks was discharged from the military in 1992 and returned home to West Memphis where he was informed by the petitioner's mother and sisters that the petitioner had been arrested. He said that Paul Burks was a mutual friend of his and the petitioner's and that Burks had passed away. Brooks said that, during the "period after high school," the petitioner wore his hair in a "low fade," and could not recall a period during which the petitioner wore a "jheri curl." Brooks said the last time he saw the petitioner, in March 1992, he was wearing a "low fade." He said he was not contacted by the petitioner's trial attorneys.

Rodney Weatherspoon testified that he grew up in the same neighborhood with the petitioner.

14

They saw each other about three times a week after they graduated from high school. At one point, they were in a rap group together known as the "Hall of Hell," which consisted of "six to eight" members, mostly from West Memphis. Kevin Shaw, a resident of Memphis, was a member of the group and wore "baggie pants" and "[s]ometimes" a trench coat and dressed "[s]omewhat" differently from the members from West Memphis. The petitioner dressed like the other members from West Memphis, *i.e.*, "T-shirt, Levis, tennis shoes." Weatherspoon said that the members from West Memphis wore their "hair in fades," while the members from Memphis preferred "the processes with the chemicals and whatever." He recalled that Kevin Shaw had longer hair and "mostly wore the little curl." Weatherspoon remarked that he never knew the petitioner to wear his hair long or to wear a jheri curl.

Leslie Burns, the petitioner's mother, testified that she became involved with his case shortly after his arrest. She recalled that initially he was appointed attorneys, but they were dismissed because one of them "had a lot of involvement with the victim's families." She then retained an attorney for the petitioner, paying him a $700 retainer fee and signing an agreement to pay $17,000 for his representation. However, this attorney was dismissed by the trial court as not being qualified to handle a capital trial, and the court appointed senior and junior trial counsel. She and the petitioner's father, Obra Carter, met with senior counsel and gave him addresses, information about the family, and telephone numbers. Ms. Burns related that, at this time, two of her sons lived in Chicago, three daughters had moved out, and three daughters lived at home with her. Counsel did not seek information regarding the siblings who did not live at home.

A second meeting, lasting under an hour, was held during which both senior and junior counsel were present. Counsel discussed the petitioner's case with Ms. Burns but did not ask about the petitioner's background or for her to sign releases of information. At the conclusion of this meeting, Ms. Burns "left . . . knowing what [the petitioner] was charged with but they never told [her] anything about any evidence." She understood that the petitioner had been charged with two counts of first degree murder and that the codefendants would be tried separately.

She attended the trials of Carlito Adams and Derrick Garrin, although not in their entirety, and never saw the petitioner's attorneys at those trials. She said that Derrick Garrin went to school with her son and lived in the same neighborhood, but she did not know Carlito Adams prior to this incident. During their trials, Ms. Burns took notes which she attempted to give to senior counsel, but he said he did not need them. She stated that junior counsel was "kind," but senior counsel was "always rude to [her]." She noted that she only met with junior counsel twice, with one meeting occurring in the courthouse.

Ms. Burns recalled that senior counsel talked to her about convincing the petitioner to accept a life sentence, saying "it was the only thing he could do." She did not agree with counsel's suggestion because she believed that a death sentence was an impossibility, based on the fact that the death penalty was no longer being sought "in the young man's trial [she] was at that day." She did not think it was "fair" for counsel to ask the petitioner to accept a life sentence because she "believed" in her son and "didn't believe he deserved that." She said that trial counsel never

15

informed her as to the exact nature of the charges against the petitioner, *i.e.*, the elements of the offense. She did not know that the State was seeking the death penalty until the petitioner's trial had already started. Trial counsel never visited her in West Memphis or tried to contact any of her children or any of Obra Carter's children.

She said she attended every day of the petitioner's trial. During the trial, senior counsel was "[r]ude as usual." The first time she learned of the bifurcated proceedings in a capital trial was the day that the jury returned guilty verdicts as to first degree murder. Prior to this, counsel had never discussed the need for evidence about the petitioner's life and background, and she did not learn that she was to testify during the penalty phase until the day she was called as a witness. She denied telling other individuals not to come to court or not to cooperate with the petitioner's attorneys.

Ms. Burns said she had five children with Nathaniel Burns: Billy Ray Burns in 1956; Brenda Fay in 1958; Nathaniel Burns, Jr. in 1959; Patricia Ann, in 1960; and Michael Anthony in 1962. They separated in 1962, and, in 1967, he left Arkansas for better employment. In November 1963, she met the petitioner's father, Obra Carter, in West Memphis, and they began dating a few months later. Although they never married, their first child, the petitioner, was born on April 20, 1969. Four more children followed: Sharon in 1971, twins Robin and Lisa in 1973, and Renita in 1974. At some point, she learned that Carter had another girlfriend, Louise Hall, who lived in Memphis, with whom he had twin boys. Ms. Hall eventually moved to West Memphis, and Carter "was just back and forth" between the two families. Her relationship with Carter ended in late 1979 or early 1980. She and her children had lived in rented two-bedroom houses in West Memphis until 1971, when she was approved for a four-bedroom apartment in a housing project in West Memphis. She resided in this apartment with her children until 1975, when she was evicted for having another child, Renita, which was against "the rules." During this time, she regularly received child support from Nathaniel Burns. Although Obra Carter never provided child support, he did take "care of some of the major things like the rent, utilities, buying food or clothing or whatever the children might need." She eventually moved to Memphis with her children; however, two incidents occurred that caused her to move back to West Memphis. Specifically, the petitioner was "lost" for approximately four or five hours one day after he was mistakenly dismissed early from school, and her daughter, Lisa, had suffered from lead poisoning caused by paint chips in the house they were living in at the time.

In 1976, Obra Carter purchased a house on East Polk Street in West Memphis for Ms. Burns and her children, and, in 1998, he transferred ownership of the house to her. The one-thousand-square-foot house contained three bedrooms, a living room, a small dining area, a kitchen, and one bathroom. When she moved into the house, Ms. Burns had seven children and one grandchild living with her. She said that Carter visited two or three times a week to check on the children but never lived with them. Carter eventually married Louise Hall, and Ms. Burns was often embarrassed by the fact that she had four children by Carter and that he was married to another woman.

Ms. Burns said that her son, Nathaniel Burns, Jr., was murdered in Gary, Indiana, on July 9, 1996, by her brother, Alex. On cross-examination, Ms. Burns affirmed her trial testimony that the petitioner was "a good son, never caused any trouble."

16

The post-conviction court then questioned Ms. Burns regarding Archibald and Madlock's representation of the petitioner. Specifically, the court made inquiry as to Ms. Burns's basis for objecting to their continued representation. She said that, in her opinion, Madlock was more attentive to the victims' families than to her. She "was concerned that [Madlock's] friendship with them would be more than his concern for [the petitioner]." She said that, at the time of the incident, the petitioner was still living with her. She recalled trial counsel trying to get the petitioner to cut his jheri curl hairstyle, which he got while in jail. She did not know until trial that the shooter allegedly wore a jheri curl.

Regarding the petitioner's prior convictions, she said the theft conviction was the result of a misunderstanding. Her niece's husband had asked the petitioner to help him pick up an air conditioner, but it turned out that the air conditioner was stolen. The petitioner was placed on probation for this offense. She acknowledged that the petitioner was arrested for the instant offenses in Chicago and had given a statement to law enforcement officials there.

Ms. Burns, on redirect examination, confirmed that, at the time of the incident, the petitioner wore his hair "short" and only started growing his hair long after he was arrested. She did not know why he was growing his hair longer, but she had observed that "just about every young man that [she] saw when [she'd] come to visit this facility had that Jheri Curl in their hair and they got it here from somewhere upstairs where they were incarcerated."

Louise Carter, the petitioner's stepmother, testified that she met Obra Carter in May 1959 in West Memphis. She knew that he had a girlfriend, Zettie Clark (Thomas), at the time who he married in 1961 because she was pregnant. Mrs. Carter continued to see Mr. Carter "off and on" during his marriage to Zettie Clark and later became pregnant, giving birth to twins, Reginald and Ronald, in September 1962. The following month, she and the twins moved in with Carter. More children followed: Marcus Antonio, 1965; Frederick, 1966; Yolando, 1967; Phillip, 1968; Michael, 1971; Steve, 1972; and Dericus, 1985. Mrs. Carter stated that she and Mr. Carter had never really separated and explained that their times apart were because his job took him out of the area.

In 1964, Mrs. Carter heard rumors that Mr. Carter was seeing Leslie Burns. At that time, Mr. and Mrs. Carter had a "common law" union but were not legally married until 1979. Mrs. Carter questioned Mr. Carter about Leslie Burns, but he denied any relationship with her. She recalled an incident at a medical clinic during which she was questioned about payment of a medical bill, the "collection agent . . . ask[ing] [her] . . . who is the wife. Is it you or is it Leslie Burns?" It was only when Mrs. Carter confronted Mr. Carter with the medical bills that he admitted to her that he was the father of five of Leslie Burns's children. Mrs. Carter said that, sometime after this event, Mr. Carter introduced his children by Ms. Burns to their children. Mrs. Carter said she was never contacted prior to trial by counsel for the petitioner and would have been willing to testify on the petitioner's behalf.

Renita Jo Burns, the petitioner's sister, testified that, in 1992, she lived at her mother's home along with the petitioner. She had never known the petitioner to have shoulder-length hair or use

chemicals on his hair. She recalled that, at certain times, there was as many as twelve people living in their home. She recalled hearing gunshots "[a]lmost every day" coming from the projects. The gunshots, which occurred mainly at night, frightened her because she feared one of the bullets would strike their house. When she was about fourteen years old, one bullet did strike their house, shattering a mirror in her mother's room. Although they never had to call the police to their neighborhood, she saw "police cars all the time over in the projects." There was a liquor store directly behind their house where numerous fights occurred, and men often relieved themselves in their backyard, all of which frightened her.

She said she and the petitioner had a good relationship, the two being "real close" and spending much time together. She regarded the petitioner, her oldest brother, as the man of the house because their father was not there, and he acted as a chaperone to his younger siblings. They saw their father "every two weeks or something like that. Not often." Renita added that their father never attended their birthday celebrations, nor did they receive birthday gifts from him. When their father did visit them, he was "real strict" with them, often yelling at their mother. She learned of her father's other family when she was about five or six years old when he took all of the Burns children to meet the Carter children. She said she was never contacted by trial counsel and would have testified at trial.

On cross-examination, Renita Burns stated that, although her home was crowded, they all loved one another, got along with one another, and took care of one another. She conceded that her mother had raised them well. On redirect, she explained the difference between her mother and father's method of discipline. She stated that Obra Carter threatened the children with a "whipping" if they disobeyed and recalled one incident when her father "whipped" her with a switch, leaving marks on her legs. Their mother established rules and the children basically obeyed her.

Robin Michelle Burns, another of the petitioner's sisters, confirmed that Mr. Carter "whip[ped]" them for things such as leaving the house or playing with the neighbors. She described the "whippings" as Mr. Carter striking the children's legs or arms with a switch or belt. If the children were not at home when Mr. Carter arrived, they were punished because he wanted them at the house at all times. She said that their father whipped the petitioner on several occasions, once striking him with a belt by his ear. She said she was never contacted by trial counsel and would have testified at the trial if asked to do so. Upon examination by the post-conviction court, she stated that Mr. Carter spanked her and her siblings "a lot" during their childhood. Their mother, however, never spanked the children. Rather, she took away the children's play time or imposed other restrictions as a means of punishment. When their mother worked at night, the children locked the door and stayed in the back watching television. When their mother was not at home, they were not allowed outside of the house. She said she dropped out of high school in the eleventh grade. She had no knowledge of the rap band that the petitioner was involved in at the time of his arrest, although both were still living in their mother's house. She did not think that the petitioner was employed in 1992.

Brenda Burns, the petitioner's half-sister and the oldest daughter of Leslie and Nathaniel Burns, testified that Obra Carter visited her mother's house once or twice a week, sometimes

18

spending the night. Her mother returned to work after Sharon was born in 1972, leaving her in charge of the younger children. Ms. Burns could not recall a time when their electricity had been disconnected because of non-payment. She denied ever hearing gunshots coming from the projects while at her mother's house but said she had been in the projects and heard gunshots. Ms. Burns lived with her mother until 1979; her children, however, remained at her mother's house.

Phillip Carter, a son of Obra and Louise Carter and the petitioner's half-brother, testified that he was employed as a Crittenden County, Arkansas, juvenile probation officer and also as a deputy sheriff. He testified at the petitioner's trial in 1995, at both the guilt and the penalty phase. He first met the petitioner's attorneys "minutes prior to [his] testimony," saying that he was in the courthouse because he had already planned to attend the petitioner's trial. He was not advised as to the nature or scope of his testimony and was not questioned as to his relationship with the petitioner.

Phillip Carter recalled that his 1995 testimony was limited to whether he grew up with the petitioner, what schools he attended, and what kind of person the petitioner was. Carter recalled being questioned as to whether the petitioner had ever moved away, to which he responded that he had in 1991, but was never asked the reason for this move. He explained to post-conviction counsel that the petitioner had moved to Jonesboro to gain employment with a Shoney's restaurant. At the time, both Carter and the petitioner had been working at the Shoney's restaurant in West Memphis. The petitioner was asked by the executive manager, who had been transferred to the Jonesboro location, to accompany her to that location as her assistant and he accepted this offer. The petitioner returned to West Memphis a year later, where he worked at the local Shoney's restaurant. Mike Hissong, the district manager, offered the petitioner a position at a Shoney's restaurant in Memphis, which the petitioner accepted. The petitioner was still employed by Shoney's at the time of the incident leading to his arrest. Phillip said trial counsel never asked him about the petitioner's employment.

Regarding "house rules" during his childhood, Phillip Carter explained that they were not allowed to leave the yard without permission, had to make their beds as soon as they awakened, and had to complete all of their household chores and homework assignments. Fighting was not tolerated. He said the rules, especially the one about not leaving the yard, were strictly enforced. In rationalizing his father's rules, Phillip explained that their neighborhood was "somewhat dangerous." He said they walked to school, which was about five blocks from their home. The children referred to their yard as "Alcatraz or imprisonment." When their father was not at home, his mother allowed the children to leave the yard with the understanding that they return at a designated time. He said that failure to obey his father's rules resulted in "corporal punishment." He described "corporal punishment" as "[w]hippings" with a belt or, on one or two occasions, "extension cords." Although the whippings sometimes caused "a small welt," they never broke the skin.

Phillip Carter described an incident during which he, Michael, Steve, and the petitioner were playing basketball in the backyard and "tempers flared up," resulting in a physical confrontation. Their father "called it to a halt" and directed the children to come to him, but Phillip refused. This

19

incident resulted in Phillip leaving the home to stay at his sister's house for the night. He returned home the next day and was disciplined along with his brothers.

Phillip Carter further testified that the Carter children were allowed to participate in extracurricular activities and that his neighborhood was considered better than the petitioner's because there were gang members, "[t]he Rayfield Posse," near the petitioner's neighborhood. He stated that area had a high crime rate and was "still the highest crime area in West Memphis." Phillip testified that there was another gang, "the Delta Dogs," that operated near his neighborhood. The "Delta Dogs" and the "Rayfield Posse" were rival gangs and fought often, with most of the fights occurring at school sporting events. The gangs fought with brass knuckles, bats, sticks, guns, knives, and ice picks. He added that much gang activity, including robberies, occurred at the market behind the petitioner's house. In this regard, Phillip recalled an incident where a friend of the petitioner's, Paul Burks, was "jumped on" by the Delta Dogs as he got off of the bus. The petitioner witnessed this beating and fled for his own safety. Phillip stated that neither the petitioner nor Burks was associated with the Rayfield Posse, although most people in the neighborhood were associated with one of the two gangs.

When he was twenty-one years old, Phillip Carter purchased and registered a gun which was later destroyed by the City of West Memphis. He explained that the petitioner had asked to borrow his hair clippers and he kept his gun in the same bag as the clippers. Forgetting about the location of his gun, he gave the petitioner the bag and the petitioner was arrested for carrying the weapon. In lieu of fines for the petitioner, Carter agreed to let the city destroy the gun. Carter stated that the petitioner did not have long hair prior to his arrest.

On cross-examination, Phillip Carter stated that the petitioner was never in trouble as a juvenile and that no one in either family got into trouble because their father would have been extremely upset if any of them broke the law. Carter also admitted to the post-conviction court that both he and the petitioner were raised to know the difference between right and wrong. There were nine children in the Carter home. Carter described their house as a four-bedroom house with two full bathrooms. He stated that the Carter house was "a bit larger" than the Burns house.

Steve Carter, the second to youngest child of Louise and Obra Carter, testified that he previously had been convicted of selling drugs and had spent time in prison for this conviction. At the time of the hearing, he lived in West Memphis and was employed as a forklift operator. He recalled his first meeting with the petitioner and his siblings. After that meeting, the petitioner played sports and attended church activities with the Carter children. Carter also visited the petitioner at his house and described the neighborhood as "pretty good." He stated there were "[a] few gangs" around the neighborhood, but the petitioner was not involved in them, and there were "quite a few gangs" in his own neighborhood. The gang associated with the petitioner's neighborhood was the "Rayfield Posse," and the gang in his own neighborhood was known as "NWA," "Niggers with Attitude," of which he was a member. The petitioner was associated with "NWA" because he was Carter's brother. Carter's membership in "NWA" caused the petitioner problems in his neighborhood on one or two occasions, and once shots were fired at the petitioner.

Steve Carter reiterated the testimony of his brother, Phillip, regarding Obra Carter's rules for his children. To his brother's list of rules, Carter added several, including the children had to eat what their mother cooked, attend every church activity, and not share food with other people. Regarding this last rule, he explained that they could not accept a cookie from a friend and described an incident that happened at a football game where he took a bite of a friend's pickle. His father observed the incident from the stands and later took him home and beat him. Carter testified that he received "beatings" with a belt or extension cord "almost every day." He described the beatings as "[n]onstop. I mean he had to get tired before it would stop." Carter added that the beatings caused "[b]ad bruises and welts" and that the petitioner received beatings also. Obra Carter hit their mother, Louise Carter, "[p]lenty of times" and often embarrassed Mrs. Carter and all of the children, including the petitioner, in public. He said that their father would embarrass the children by making them come inside the house when they were playing ball with their friends. He also recalled hearing about an incident when Obra Carter broke Leslie Burns's jaw.

Questioned by the post-conviction court, Steve Carter stated that some of his brothers, Reginald, Ronald, and Fred, had been incarcerated for various misdemeanors. He knew about the petitioner's involvement in a rap band and knew Derrick Garrin from school. He watched the band perform and attended a recording session. Carter said he had never known the petitioner to wear long hair, saying "[h]e always kept short hair. Real short."

George Michael Hissong, a senior vice-president with Shoney's Restaurant, testified that in 1991 the petitioner was employed at the West Memphis location, where he was general manager. Hissong recalled that the petitioner was a good worker and "mov[ed] up through the ranks." He added that the petitioner had no difficulty learning his job duties and was dependable and polite. Hissong stated that, at the time of the petitioner's arrest, the petitioner wore his hair "short." He was surprised to learn of the petitioner's involvement in a killing because it was contrary to the petitioner he knew. He stated that he was never contacted by the petitioner's trial counsel or an investigator. In 1995, he was in Memphis, Tennessee, employed at Shoney's.

Thomas Bloom, a Nashville-based attorney, testified that he "had run an ad . . . in the Tennessee Bar Journal advertising [his] services as an appellate attorney, as well as a research and writing attorney." After he was contacted by senior trial counsel to prepare the petitioner's initial appellate brief for the Tennessee Supreme Court, he obtained a copy of senior counsel's brief that was submitted to the Court of Criminal Appeals. He said that the appellate issues were developed by senior and junior counsel and that he was not at liberty to add any other issues. He filed the brief with the Supreme Court on behalf of senior and junior counsel.

Dr. Lee Norton, a clinical social worker, testified as to the duties of a mitigation specialist:

> The primary role of the mitigation specialist is to assist the attorney by conducting a comprehensive social history evaluation of the client. Other roles that the mitigation expert may play are to educate the attorneys about areas concerning

21

mental health issues, issues of working with impaired clients and their family members and individuals who know them and have information about them, working with developing a team that's going to be best suited for the needs of the client, conducting research into special topics.

Dr. Norton recognized that attorneys and their staff, including investigators and paralegals, are trained to gather relevant information, yet they are not trained to detect signs of mental illness or other problems. This factor may inadvertently impede the ability to gather sensitive information. Dr. Norton opined that another crucial task is to gather social history information of the defendant's family before the defendant's birth. Dr. Norton stated that "three generations of research [is completed] in order to find out important patterns," known as a genogram, or annotated family tree. Dr. Norton stated that the genogram of the petitioner was incomplete because the research was not complete. She said the background information not only includes interviews but also securing various documents, and she explained that it took her three years to obtain one document from the FBI.

Dr. Norton testified that she was asked by post-conviction counsel to conduct interviews and locate documentation that could assist counsel in learning about the petitioner's family. Immediately, barriers to communication were apparent. Dr. Norton noted that some of the petitioner's siblings had problems and that there was an unusually large number of people in the family. She further noted that "it wasn't a traditional family in the sense that [the petitioner's] father was married and had a relationship with [the petitioner's] mother and children were born to both." There were also suspicions of problems in the neighborhood that could have influenced the petitioner.

As her investigation continued, Dr. Norton discovered that there had been a communication problem between trial counsel and the petitioner and his family. She acknowledged that this was evidence of counsel's "improper skills" or "inability to recognize barriers." She opined that trial counsel were unable to establish trust and rapport with the petitioner's family. She stated that neither she nor the post-conviction defender's investigator had any problems establishing a rapport with Ms. Burns. Dr. Norton stated that Ms. Burns was always willing to talk with her and never refused to discuss anything pertaining to herself, her family, or the petitioner. Dr. Norton said, however, that she relied upon her clinical skills in interviewing Ms. Burns, in order to let Ms. Burns "set the pace" and discuss matters in her own way. She stated that she interviewed Ms. Burns four times, gathering new information at each meeting. During these interviews, Ms. Burns was cooperative and related her difficulty with trial counsel. In interviewing Ms. Burns, Dr. Norton found it significant that she discussed her own childhood and her relationships with men. Dr. Norton also found it significant that Ms. Burns had been injured by Obra Carter. Trial counsel were not privy to this relevant information.

Dr. Norton related that Ms. Burns had experienced trauma "throughout her lifetime." One of the earliest traumatic experiences was when her sister fell into a fireplace and was badly burned. This accident affected the dynamics of the family because their grandmother, who raised them,

treated the two sisters differently. Ms. Burns had an excessive amount of chores and had to balance school work with her work in the cotton fields. At age fourteen, Ms. Burns left her grandmother's home and became involved with Nathaniel Burns. They subsequently had five children together; the first, Billy, was born with severe brain damage and diagnosed with cerebral palsy. Dr. Norton related that the presence in a home of a child with Billy's disabilities creates a "risk factor" as to the other children in the household. Other "risk factors" included the fact that Ms. Burns "had so many children in quick succession" and her resultant physical problems, the fact that she was not legally married to Nathaniel Burns, a catastrophic injury sustained by Nathaniel Burns and the impact of this injury on his earning capacity, and the couple's eventual separation.

Regarding the relevance of these events that occurred prior to the petitioner's birth to Ms. Burns's ability to nurture and care for the petitioner, Dr. Norton stated that Ms. Burns "endorsed a number of the criteria for depression, for ongoing depression," *e.g.,* "[s]he was tired . . . often sad . . . lonely . . . had negative thoughts a lot of the times . . . [and] was extremely self degradating [sic]."

Dr. Norton also interviewed Louise Carter. During their initial meeting, Obra Carter was present and spoke "rapidly and mostly about religious topics" while Mrs. Carter "spoke very little." She later met alone with Mrs. Carter who described her relationship with Mr. Carter as "a very tumultuous and chaotic and hostile relationship that she quote 'felt [she] cannot get out of.'"

Dr. Norton interviewed Obra Carter at his home and was immediately "taken by how small the home was." She was shocked as to the condition of the bathroom and kitchen. The only light source in the bathroom was a candle. She felt that the house was "sub adequate housing for the number of people that had lived in the home." She observed that Mr. Carter had a police scanner, which he kept on during the entire interview. She later learned that it was not unusual for events to occur in the neighborhood that would bring the police. The police scanner and the neighborhood activity brought some understanding to the children's reports that their father would not allow them to leave the yard. During one of the interviews, Dr. Norton learned that Mr. Carter had been married to Zettie Thomas prior to his marriage to Louise Carter. Ms. Thomas became pregnant and her father insisted that Mr. Carter marry her. Ms. Thomas explained that Mr. Carter went to work, came home, changed his clothes, went out, and did not return until 2:00 or 3:00 a.m. Ms. Thomas stated that Mr. Carter hit her without provocation and she felt "extremely lonely" and "very very isolated" during their marriage. At some point, Ms. Thomas' father learned that there was inadequate food in the apartment, came to Arkansas, had "some words with Mr. Carter," and took his daughter back home.

Betty Douglas, a cousin of Leslie Burns, was interviewed during the course of Dr. Norton's investigation. The two women described each other as "extremely close, as close as sisters." Ms. Douglas reported that she lived in Ms. Burns's home for several months when the petitioner was a young child. She remarked that Obra Carter did not like her and did not like her living in Ms. Burns's home. Ms. Douglas described Mr. Carter as "mean" and "domineering and dominating." She had seen Ms. Burns "with black eyes that were so severe that her eyes were actually shut" and had heard Mr. Carter scream at Ms. Burns, calling her "a bitch, a slut, and a whore and saying that

she was sleeping with other men." Since the children were in the same room with her, Ms. Douglas assumed they also heard this. Dr. Norton concluded that, in her professional opinion, Obra Carter abused Louise Carter, Leslie Burns, and Zettie Thomas both physically and emotionally.

Dr. Norton further testified that not until Obra Carter's religious conversion did he tell any of his children that he loved them. From her interviews with Steve Carter, Renita Burns, Robin Burns, Sharon Burns, and Brenda Burns, Dr. Norton identified certain facts that constituted emotional mistreatment of the children by Mr. Carter, including persistent fear of the caretaker, lack of positive reinforcement, and physical abuse of their mother. She had not had the opportunity to completely assess the petitioner with regard to whether his father's treatment had an effect on his development but felt "confident in saying that the climates in both households primarily toward the father was that of trepidation, anxiety and fear." She added that "witnessing or learning about severe physical harm especially to one's mother can cause tremendous traumatic reactions in children." Dr. Norton stated that children who live in this type of environment have "more trouble coming to understanding themselves, develop problem solving skills, use language and means of talking things through, coping mechanisms tend to be affected, relationships tend to be affected. They tend to misperceive the actions and the communications of other people."

As to other risk factors involved in the petitioner's development, Dr. Norton said that children grow up in three domains: home, school, and community. Dr. Norton characterized the petitioner's home climate as overcrowded, "an overtaxed mother with limited resources," and "a whole bunch of stressors." She described the petitioner's school climate with factors including a large amount of violence, anxiety, and fear. Finally, Dr. Norton depicted the community climate with factors including high crime rate, violence, and police presence. Dr. Norton explained that it is the "synergy of these three factors that really increases the risk for these children of being able to do well in school, to be able to take in, assimilate, accommodate new information, to be able to assess social cues and respond appropriately, to be able to engage in positive productive relationships and a number of other spheres."

Dr. Norton reviewed the petitioner's elementary and high school records, including a health report. Dr. Norton stated that, although she was still without sufficient information to make a final conclusion, in her opinion, the petitioner's judgment was extremely poor and immature at the time he committed the crimes. She added that his "coping skills were not good" and that "his ability to engage in problem solving and project cause and effect did not appear to be good." These impairments were consistent with the risk factors present during the petitioner's developmental years.

Dr. Norton testified that she and a colleague first began working on the petitioner's case on September 28, 2002. Fifty hours of work were initially approved by the court, and another fifty hours were later approved. Dr. Norton requested funding for out-of-state travel, but her request was denied. Co-counsel asked Dr. Norton if she would agree to work for $65 an hour, but she could not, so work was stopped on the case.

24

On cross-examination, Dr. Norton stated that she did not take notes because she worked with an investigator who took notes. Dr. Norton did not bring her case file to court and said that it only contained information provided to her by post-conviction counsel. She acknowledged that, because her role was circumscribed in this case, she did not collect any records. She stated that she had not interviewed all necessary persons, including a number of family members and the petitioner's teachers, and that her investigation was not complete at the time of the post-conviction hearing. Dr. Norton then described her role as assisting the investigator with interviews. She denied any discussions of her being an expert witness at the hearing until the Thursday before the hearing. She added that she had not reviewed any records collected by post-conviction counsel as they were received after a request for additional funds for her were denied. She understood her role in this case was that of a consultant and said that, had she known she was going to be called to testify as an expert, she would have prepared differently. Dr. Norton clarified her job duties by explaining that her "primary role was to see if [she] could work with the investigator and the family because you had indications that there were some family systems problems and some other things that were going on that they were for one reason or another unable to articulate." She stated that her role evolved into that of a mitigation expert.

The State questioned Dr. Norton about the five-month delay between the time she was retained by post-conviction counsel and the time she first interviewed Leslie Burns. She explained that this case was "unusual" in that there was a continuance and recalled that the investigator had become ill. Finally, she stated there was lapse in the funding.

Dr. Norton stated that she never reviewed the petitioner's social history records because the investigator had discovered that many had been destroyed "because of the new rules that records only have to be kept for so long." She only interviewed the petitioner once. She acknowledged that all of the information she had regarding the petitioner was interview notes and that the witnesses interviewed were primarily neighborhood friends of the petitioner. She said that all of these people "liked" the petitioner, felt that "he was a good kid," and that he "[n]ever got in trouble." Although Dr. Norton recognized there were limitations on the petitioner's activities as a child, she acknowledged he often spent the night at the homes of different neighbors, and one neighbor provided information that the petitioner had done "all kinds of odd jobs around the neighborhood." Dr. Norton agreed that none of the initial interviews conducted in 1999 and 2000 illustrated an abusive home life and that the only negative recurrent theme in these interviews was the people that the petitioner "tended to hang out with."

A statement from Kay Carter, one of the petitioner's siblings, provided that "[the petitioner's] best quality was dealing with family members. His worst quality was friends he was hanging around with." Family members also said that, when the petitioner became involved with the rap band, he stopped attending church. While Dr. Norton acknowledged these statements, she explained that the petitioner, being the only male in his household, began spending time in his father's neighborhood with his half-brothers. She explained that this neighborhood was "a rougher neck of the woods" and that the petitioner was "more of a follower." Dr. Norton acknowledged that the neighborhood in which the petitioner was raised had changed over the years.

Dr. Norton acknowledged that the petitioner's father had stated that the petitioner "was very smart, that he could fix ceiling fans and plumbing. He also said he was an artist." She said that Steve Carter was the "most explicit" witness who painted a negative image of his home life with Obra Carter. She agreed that "the consensus of all the statements was that [the petitioner] was a nice kid. Took care of his family. Was good to his friends. Was good in school. And what happened on the day of the killing was completely out of character for him." She commented that the petitioner "seemed to be a child who minded what he was told" and "demonstrated a lot of kindness."

Dr. Norton related that, after interviewing the petitioner, she had "concerns that [she] felt were out of [her] purview and in an abundance of caution [she] wanted to convey to the lawyers that it might be a good idea to have him evaluated by a medical doctor." One of her concerns was "[h]is speech was a little bit pressured." She explained that he spoke quickly, which was inconsistent with the gravity of the situation, and that his "religious faith . . . seemed to exceed again the gravity of the situation." Another concern was that the petitioner did not appear to be depressed about his situation. She felt that "somebody who could do a more thorough mental status exam should probably take a look at [the petitioner]." In this regard, Dr. Norton acknowledged that the petitioner had been examined by a psychologist who concluded there were no signs of "any overt psychopathology" and that the Department of Correction also had examined the petitioner as part of his classification process and found no evidence of mental illness.

Dr. Norton stated that she never talked to the petitioner's trial attorneys regarding their relationship with the petitioner or his mother. She said that the petitioner's mother did her best to raise the petitioner and instill in him good values. She agreed that, prior to the commission of the crimes, "[t]here may not have been anything obvious to suggest that . . . [the petitioner] was maladjusted." She further agreed that the individuals interviewed believed that the "reason he got in trouble was he was a follower and got with the wrong group."

On redirect, Dr. Norton explained that the initial information gathered "seemed to be inconsistent" and that there was a "disconnect" between the crime and the petitioner's personality. An important piece in solving this puzzle was the extreme complexity of the petitioner's family system. She added that all of the positive aspects of the petitioner's life also constituted mitigation evidence as "a sharp contrast between that kind of behavior and subsequent involvement in an event as hostile as this."

Dr. George Washington Woods, Jr., a physician specializing in psychiatry, testified that he was contacted by the post-conviction defense team to evaluate the petitioner. Dr. Woods stated that a "neuropsychiatrist really focuses on the relationship between the brain and behavior to a much larger extent perhaps than the average clinical psychiatrist." While he acknowledged that he was not a neuropsychologist, Dr. Woods stated that he "certainly underst[oo]d neuropsychological testing and the uses and indications for neuropsychological testing." He worked with Dr. Kertay, a clinical psychologist; Dr. Pamela Auble, a neuropsychologist; and Dr. Norton, a mitigation specialist.

Dr. Kertay completed a psychological evaluation of the petitioner that was performed over three days, and Dr. Woods consulted with him regarding the report. Dr. Woods testified that he utilized Dr. Kertay's evaluation to determine any indication of malingering, which he defined as "the production of symptoms in order to either exaggerate or develop a psychiatric or physical illness," and to "look at the battery" of tests utilized to reach the conclusion. Dr. Woods explained that neuropsychological testing is different from psychological testing in that "[p]sychological testing is the MMPI, the Rorschach, which really looks at personality," while "[n]europsychological testing . . . is really the gold standard." He explained that "neuropsychological testing done appropriately is the best that we have at this date to look at how the brain functions."

Dr. Woods said that the petitioner's testing showed that he "worked on hard on the test" and put forth "good effort." Dr. Woods said testing results reveal "islands of strengths and islands of weakness," and the petitioner's strengths were his average IQ, although his academic expertise was a slight bit below average. Dr. Kertay's report indicated that the petitioner demonstrated "a defensive denial that could contribute to difficulty understanding the implications of his circumstances and behavior." The petitioner also reported "strong unusual religious experience and visions that are not experienced by most people and that are accompanied by a sense of joy and peace out of keeping with his environment." Dr. Woods also stated that the tests revealed an "elevated score on the bizarre mentations scale of the MMPI 2 which suggests that his unusual thoughts and perceptions border on the psychotic being at the least highly id[i]osyncratic." Dr. Woods related that the petitioner's "unusual religious experience, while a genuine expression of his beliefs, are also defensive in nature and serve at least in part to shield him from difficult feelings." Dr. Woods agreed with Dr. Kertay's conclusion that the petitioner "has a tendency to deny pathology. To deny pain. To present the world in the most positive light." He explained that did not mean the petitioner is psychotic or has a psychiatric disorder. Dr. Kertay's evaluation also revealed that the petitioner had difficulty "processing new information quickly potentially delaying his ability to comprehend his circumstance despite quote knowing better unquote." Dr. Woods explained the relevance of this fact to the petitioner's case as the petitioner "fails to grasp the implications of his behavior when he is under stress and is required to quickly understand a complex situation."

Dr. Woods testified that he met with the petitioner in jail in late March 2003 and described the petitioner as "courteous to a fault" and "interested." Dr. Woods's main concern was that the petitioner "did not seem to grasp the gravity of the situation that he was in although he understood it." In this regard, Dr. Woods stated that the petitioner was competent in terms of understanding what had occurred, the roles of the various court officers, and the charges he was facing. Notwithstanding, he opined that the petitioner denied the seriousness of his circumstances and the various interventions that could have been made.

Dr. Woods stated that prior to interviewing the petitioner he had reviewed Dr. Kertay's report, the records documenting the births of Leslie Burns's children, "some school records," and the memoranda of interviews with family members and friends. Based on this information and his two-day interview of the petitioner, Dr. Woods was of the opinion that certain issues needed further evaluation.

27

Dr. Woods said that further psychological testing was performed by Dr. Pamela Auble. This additional testing was necessary, according to Dr. Woods, to determine whether the petitioner's behaviors were "symptoms." One particular test performed was the Dallas Kaplan, a test of "executive functioning." Dr. Woods explained the different parts of the brain and their functions. He stated that the frontal lobes, also referred to as "the cap of the brain," develop over time and are "the part of the brain that allow people to acquire what's called executive functioning, the ability to weigh and deliberate, the ability to sequence, the ability to conceptualize, the ability to understand that all these trees are a forest." He further explained that the "frontal lobe also controls the ability of people to understand emotional input called prosody." Dr. Woods found nothing wrong with the petitioner's temporal or occipital lobes but was concerned about his frontal lobes because of "this denial, this kind of inability to sequence . . . to both understand the gravity of the situation."

Dr. Woods said that Dr. Auble noted that "there was a tendency [of the petitioner] to respond quickly to superficial aspects of situations, a style that can lead to errors." He also observed that the Wechsler memory scale test, given to the petitioner by Dr. Kertay, indicated that the petitioner's "psychological profile is consistent with someone who is a quote follower unquote rather than a leader." Dr. Woods confirmed that the petitioner was "generally friendly," "eager[] to please," "helpful," and had "trouble understanding that others around him are not as well intentioned as he may be." Testing conducted to reveal the petitioner's learning style indicated that he did not retain much information the first time it was presented; he scored in the twenty-first percentile. Repeated exposure to the information did increase the amount retained by the petitioner; he scored in the thirty-ninth percentile. Dr. Woods stated that these scores were consistent with someone who fails to grasp the important information when it is presented quickly and for the first time. Dr. Woods opined that the test results consistently indicated that the petitioner was "someone that moves so quickly that they often don't wait and deliberate. We're talking about someone that doesn't gather all the information before they make decisions."

As the evaluation proceeded further, Dr. Woods realized the impact that the petitioner's environment had on him, specifically, the relationship with his father and his father's violent tendencies. Dr. Woods also noted the importance of investigating any genetic components to one's psychological well-being. In developing a genetic link, a genogram is often used. Dr. Woods explained that a "genogram is a document that identifies generations of family members and identifies physical problems, medical problems, psychiatric disorders so that you can look at it and develop some understanding of whether there are genetic as well as social components to the person's life that you're looking at." Although the genogram was not actually completed in the petitioner's case, from what was finished, Dr. Woods stated there were indications that he would classify as behaviors rather than symptoms. Dr. Woods noted that he had "real questions about mood disorders in this family" as there are "real questions about genetically transmitted mood disorders like bipolar disorders or depression." He explained that the petitioner's poor problem-solving skills were moved from a behavior to a symptom based upon the results of the neuropsychological testing.

Dr. Woods also recognized that "a parent that suffers from trauma has no choice but to

incorporate that symptomotology into their own parenting." Although he did not doubt Ms. Burns's love for her children, he stated that the "tragedy [was] how much she could give in so many ways and yet in other ways how little she had available." The stress encountered from Ms. Burns's adolescence and having five children in quick succession did not, in Dr. Woods's opinion, go away. He stated that, although this trauma may not have impacted her day-to-day life, it affected the way she entered into other relationships. Dr. Woods related that the overall family structure, the number of children, the size of the house, the number of people in the house, and the location of the house could have played a role in determining the effects of that environment on the petitioner. Dr. Woods explained:

> [The petitioner] has impairments in being able to weigh and deliberate. He has impairments in coping skills. He has impairments in being able to size up situations appropriately. And he has significant denial. I also know that his family constellation is a very very difficult one that had intermittent violence which as I mentioned I think is really the most disorganizing and disruptive. The memorandum of interviews . . . certainly force me to include the problems in the environment in why [the petitioner] has these symptoms because the symptoms are clear. . . . And certainly the chaos in the family as a function of this kind of multiple duality is problematic.

Because of the incompleteness of the investigation, Dr. Woods could only state that symptoms were present; he was not able to determine how they got there.

Questioned about the role the petitioner's symptoms, *i.e*., "poor coping skills, impaired judgment," played in the offenses in this case, Dr. Woods responded that the history of the petitioner was a complete anomaly of the person convicted of the offenses. The part that was consistent was the petitioner's desire to do something for a friend. Dr. Woods noted that the petitioner's flee to Chicago was related to his "impaired judgment, poor coping skills." Another issue was the petitioner's hair length and his refusal to cut it prior to trial. Dr. Woods stated this was overwhelming evidence of the petitioner's "lack of understanding of the quality of the circumstances that he was facing." Dr. Woods could not say with the same certainty whether the petitioner's "symptoms" impaired his ability to accept or reject the various plea offers. Dr. Woods said the petitioner asserted that the intricacies of his situation were never explained to him. In other words, the petitioner, who maintained that he was not the shooter, did not understand his legal standing with regard to the principle of felony murder. As the distinctions between the petitioner's legal responsibility and moral responsibility were not explained to the petitioner or his family, Dr. Woods was unable to determine whether the petitioner's rejection of the life sentence was based upon the pathological symptoms or because his attorneys allegedly failed to inform him of the law.

On cross-examination, Dr. Woods stated he did not believe that the petitioner's "religious fervor" began contemporaneously with his incarceration. Rather, Dr. Woods stated that there was evidence that the petitioner "ha[d] been extraordinarily fervent in his religion for many years prior to the incarceration," although he conceded that it may have taken "on a greater energy" after his

29

arrest. Dr. Woods agreed that being on death row, in itself, is a traumatic situation.

In response to questioning by the court, Dr. Woods opined that, had the petitioner been advised of the legal implications of the felony murder rule and yet continued to reject plea offers, this would have evidenced "poor verbal memory and a poor understanding of things that are taught to him without repetitive trials." Dr. Woods said that, if the petitioner had been repeatedly advised of the felony murder rule, then he would have been able to understand it eventually.

## ANALYSIS

### I. Standard of Review

In order to obtain post-conviction relief, the petitioner bears the burden of proving the allegations by clear and convincing evidence, see Tenn. Code Ann. § 40-30-110(f) (2003), meaning that there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, the findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

When, however, the claim is based on the ineffective assistance of counsel, the findings of fact are reviewed under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citations omitted). In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). See Fields, 40 S.W.3d at 456.

On appeal, the petitioner argues that this court must "review the entire record *de novo*," asserting that "[n]o rational jurist could find that the post-conviction court made even a good faith attempt to make objective findings of fact." While we disagree with certain of the post-conviction court's conclusions, as we will explain, we likewise disagree with the petitioner's argument that we may utilize other than the standard of review set out by our supreme court in Fields.

Since the petitioner on appeal argues that he was denied his basic constitutional rights by the conduct of the hearing, we first will set out the chronology of this matter. The original petition was filed on August 19, 1999, and the post-conviction defender's office was notified to appear in court on September 24, 1999. Because of counsel's illness, official appointment was delayed until November 4, 1999. An amended petition was to be filed on December 6, 1999. Continuances were granted and the amended petition was filed on February 9, 2000. The matter was scheduled for an

evidentiary hearing on June 19, 2000. Post-conviction counsel requested a continuance and the matter was reset for October 9, 2000. A second amended petition was filed on September 21, 2000; and, six days later, post-conviction counsel asked both for a second continuance and to have the district attorney's office recused, both of which were denied. In response, the district attorney then sought to have the post-conviction defender's office removed. This latter motion was granted, appealed, and ultimately reversed. The post-conviction hearing was then scheduled for April 2002. A continuance was requested by post-conviction counsel; and the hearing was moved to November 18, 2002. In October 2002, both parties moved to continue the case until March 31, 2003. On March 7, 2003, post-conviction counsel requested a fourth continuance, which was denied; and the hearing commenced on March 31, 2003. The first hearing lasted one week and was continued until August 4, 2003, to allow the petitioner's experts to complete their work and testify. A fifth continuance was requested by post-conviction counsel on July 25, 2003, citing an outstanding request for additional funds for their experts. This request for additional funds was denied by the Tennessee Supreme Court. The hearing then resumed on August 4, consumed another full week, and was continued to September 5, 2003, for the testimony of one witness, as well as for closing arguments. On September 5, 2003, post-conviction counsel sought to file a third amended petition, which the court refused to consider because it was untimely. At the conclusion of the hearing on September 5, 2003, the post-conviction court took the matter under advisement and subsequently entered an order denying the petition on February 20, 2004.

We now will consider the issues raised by the petitioner.

## A. Finding that the Petitioner Failed to Present
## Mental Health Evidence at the Post-Conviction Hearing

The petitioner argues that the evidence preponderates against the post-conviction court's conclusion that he failed to present mental health evidence and evidence from a court-authorized psychological evaluation. In support of his claim, he asserts that Dr. Woods, a neuropsychiatrist, testified regarding mental health issues. Apparently, this issue was presented to the post-conviction court at the evidentiary hearing as a claim of ineffective counsel, which the court described as the "[p]etitioner next complains about trial counsel's failure to present ballistics, tool mark and pathology experts. Further petitioner alleges a failure to present proof of petitioner's mental health and functioning."

In its findings of fact, the post-conviction court found that the petitioner had not presented at the evidentiary hearing, *inter alia*, a psychologist and, thus, had failed to show trial counsel were ineffective in not calling such a witness at the trial:

> Petitioner was approved funds by this court to employ and utilize a Firearm examiner, Forensic Pathologist and a Pyschologist[.] No proof was presented from any such expert at the evidentiary hearing. The burden of proof is on the petitioner to show that trial counsel's failure to utilize such witnesses affected the verdict of the jury in the trial of this cause. Petitioner put on no proof regarding such experts[,]

31

therefore this issue has no merit.

To the petitioner's argument that these findings are not supported by the evidence at the post-conviction hearing, the State responds that the post-conviction court is "technically correct," because neither Dr. Auble nor Dr. Kertay testified at the post-conviction hearing and, further, the court's findings do not show that the court did not consider the reports of Drs. Auble and Kertay in reviewing the proof. In his testimony at the hearing, Dr. Woods said that he worked with Dr. Auble, a neuropsychologist, and Dr. Kertay, a clinical psychologist, and relied on their reports and evaluations. Accordingly, we conclude that the evidence does not support the post-conviction court's findings that the petitioner presented no proof as to psychological experts. Dr. Woods, "a physician specializing in psychiatry," testified at the hearing and said he had utilized a team approach, which included Dr. Norton, a mitigation specialist, and Drs. Kertay and Auble. Thus, as to the petitioner's challenge to the finding of the post-conviction court that he did not present psychological proof at the hearing, we conclude that the court erred in this determination. The petitioner ties this issue to his claim that trial counsel was ineffective, and we will apply our determination on this issue to that question.

## B. Finding that Trial Counsel Filed Numerous Pretrial Motions

On appeal, the petitioner argues that "[t]he evidence preponderates against the finding that trial counsel had filed numerous pretrial motions." Apparently, at the post-conviction hearing, a part of the claim of ineffective of counsel was that trial counsel had made errors in the motions that were filed and that the motions, considered together, were inadequate for a capital case.

The post-conviction court found to be without merit the ineffective counsel claims based upon the alleged inadequacy of these pretrial motions, concluding both that the petitioner had failed to identify any specific motion which should have been filed as well as show that the alleged inadequate motions affected the outcome of the trial:

> The next area presented by petitioner is the issue of pre-trial motions. He alleges counsel failed to file any motions pretrial. Trial counsel testified that previous counsel had filed numerous motions, which were adopted by them. No proof was presented at this hearing about any specific motion, which should have been filed or litigated, and how it would have changed the verdict. Trial counsel testified they had the entire police file and had open file discovery from the State. This issue has [no] merit.

> The [p]etitioner alleges failure to file a motion to dismiss for failure to maintain the integrity of forensic evidence. However, post conviction counsel presented no proof that in fact there was a failure to maintain the integrity of forensic evidence or that it impacted or affected the verdict rendered. It does not appear that the forensic evidence played a role in the verdict of the jury in this court's opinion. This issue has no merit.

32

. . . .

Petitioner alleges failure of trial counsel to file a motion for Bill of Particulars. Petitioner has failed to show what if any information the State had which was unknown to the defense. Trial counsel testified they had the entire State's file including the statements of all witnesses. No proof has been presented that this failure affected the verdict of the jury. This issue has no merit.

In the "Argument" section of his appellate brief setting out this issue, the petitioner makes no references to the transcript of the post-conviction hearing showing that trial counsel, or any other witnesses, were questioned about the adequacy of the pretrial motions filed on behalf of the petitioner. Instead, as we understand the argument, the petitioner asks this court to find that his trial counsel filed "a number of form motions but no serious challenge to the death penalty," that "key motions were abandoned," and that "[t]he motion for expert services was not pursued and the denial of the motion for individual voir dire was not appealed." The petitioner does not suggest what standard we use in ascertaining whether the motions filed were, in fact, "numerous," or what further action, if any, is to be considered if we conclude the pretrial motions were other than numerous.

The post-conviction court reviewed the pretrial motions, which are contained within the record on appeal, and found them to be "numerous." The record supports this finding. We note that the post-conviction court further found that "[n]o proof was presented at this hearing about any specific motion, which should have been filed or litigated, and how it would have changed the verdict." The petitioner does not respond to this determination, and we conclude that the record supports as well this conclusion of the post-conviction court.

The petitioner concludes this section by asking this court to find, apparently as the result of the alleged insufficient motions, that trial counsel were ineffective:

No court can take seriously a finding that trial counsel's motion practice was adequate in a capital case in which the only challenge to the constitutionality of the death penalty is adopting a form motion challenging a repealed statute. Yet that is precisely the finding of the court below.

In sum, what the petitioner appears to seek on appeal is our determination that the motions filed were not "numerous," without providing guidance as to what this constitutes and, then, to find that counsel were ineffective for not filing "numerous" and "particularized" motions. The petitioner cites no references to the testimony of trial counsel at the evidentiary hearing that they were questioned about the motions or any legal authorities supporting his claim that we can make findings of ineffective assistance of counsel solely on an examination of the motions themselves or what standards are to be applied in making such a determination. Accordingly, we conclude that this issue is without merit.

## C. Inadequate Cross-Examination of Eric Thomas

The petitioner's brief explains this claim:

> The evidence concerning the failure to effectively cross-examine Eric Thomas consisted of trial counsel's failure to use the transcript of Thomas' testimony in Derrick Garrin's trial. The effectiveness of such cross-examination speaks for itself. Trial counsel did use Thomas' statement to the police which named Carlito Adams as the person who shot him. However, by failing to also show that in a separate trial he identified Derrick Garrin as the shooter and person who took his money, counsel bypassed an opportunity which would have demonstrated a pattern to show that Thomas would simply identify whomever he wanted to get convicted at the moment.

As to this issue, the post-conviction court concluded that the petitioner failed to show that he was prejudiced by the alleged ineffective cross-examination of Eric Thomas:

> Petitioner . . . attacks the ineffective cross-examination of Eric Thomas. Since there were some apparent in[]consistencies in the testimony of Mr. Thomas, this Court would have liked to have heard from Mr. Thomas. However, [there] was no proof presented as to Mr. Thomas and what his testimony would have been if he had been thoroughly cross-examined. Therefore, this Court is left to speculate. Apparently, he had previously picked the petitioner out of a line-up as one of the people who shot him. In the Garrin trial he described Garrin as one of the people who shot him. He testified he was shot twice by this person and then someone else came up and shot him again. In petitioner's trial he testified that he identified the petitioner's photograph in a line-up and that petitioner took his money and shot him. He was not questioned by the State during petitioner's trial about Garrin, his description or if he shot him too. Mr. Thomas picked out petitioner's photograph two days after the shooting. Although the line up photograph was not presented to this Court . . . the Court will assume that petitioner's hair was shorter in the photograph than it was during the trial, and still the witness picked out petitioner. Again this Court is left t[o] speculate as to an explanation for Mr. Thomas's identification and testimony about petitioner's role. . . . Although this court can see some areas where Mr. Thomas could have been cross-examined, there has been an explanation given by trial counsel with regard to those areas and petitioner has failed to present any proof to the contrary. Without a showing as to what Mr. Thomas's testimony would have been under more thorough cross-examination[,] this court cannot conclude that such cross-examination would have changed the outcome of the trial.

As to this claim, the post-conviction court determined that, without seeing the petitioner's theories of effective cross-examination tested on Mr. Thomas, the court could not conclude that questioning him in the fashion the petitioner argues should have occurred would have changed the

outcome of the trial. We agree with this conclusion. Likewise, as to the claim that the State proceeded on different theories in the prosecution, we conclude, as did the post-conviction court, that the petitioner has failed to establish that this occurred.

### D. Finding that There was no Proof Presented that Kevin Shaw had a Jheri Curl or that the Petitioner was not Wearing the Black Trench Coat

The petitioner argues that "[t]he post-conviction court's findings that no proof was presented that Kevin Shaw had a jheri curt or that [the petitioner] was not wearing the black trench coat is not supported by the evidence." The petitioner does not make a reference to where precisely in the twenty-six-page post-conviction order these findings were made, and we will set out the two closest rulings we can locate to the petitioner's depiction. First, the post-conviction court found the petitioner failed to show that trial counsel were ineffective in their dealing with the petitioner's hairstyle, especially in view of his refusal to cooperate with trial counsel:

> The Petitioner complains that counsel did not explore the issue about his hair length. Although there was proof presented during this hearing about the length of the [petitioner's] hair, there was no proof presented that the petitioner gave any of those names to defense counsel during pre-trial preparation. Apparently, the only photograph available looked like the petitioner's mug shot . . . . Further the petitioner had at the time of trial a jheri curl hairstyle that matched the description given by some witnesses. The petitioner refused to cooperate with his attorney's advice to cut his hair resulting in the bolstered in court identification of an eyewitness. This court feels that the petitioner chose to ignore the advice of his attorneys and failed to cooperate with them in preparing the case by failing to give them names of people who could testify ab[o]ut his hair. This court does not feel that the attorneys should be held ineffective because the petitioner failed to follow their advice or cooperate with them.

Additionally, the court recounted the substantial proof against the petitioner as well as the lack of proof that Kevin Shaw had a jheri curl and noted that the petitioner had insisted on wearing his hair in the jheri curl style at the time of trial:

> Petitioner again raises the issue about the length of his hair. This court has reviewed the trial transcript, the portions of other trial transcripts, witness and codefendant statements. The petitioner was present on the scene and he was described as wearing a long black trench coat. No one else on the scene, to the best of this court's recollection, was so dressed. Mr. Thomas picked out the petitioner's photograph even with short hair. Ms. Jones identified the petitioner by face and by the long black trench coat he was wearing. She also described his hair as a [j]heri curl. Trial counsel knew pre-trial that Thomas had identified Petitioner's picture and they testified that their picture of [the petitioner] looked very similar to the one in the line-up. It appears to the court that Ms. Jones, who testified later, had not made

35

identification prior to trial. At trial she made an in court identification on cross-examination of the petitioner which appears to have been fully unexpected by the State or the defense. The petitioner had admitted being present on the scene, with a gun, and firing some. Thomas had identified him even with short hair. Up until that point this court is not sure that there was an issue about the length of petitioner's hair. Only when Ms. Jones described petitioner as the person with the black trench coat and jheri curl and the person she identified in court with a jheri curl, did his hair length become an issue. Again, this court is asked to speculate as to who else on the scene had a jheri curl. Petitioner implies Kevin Shaw but offered no proof by witness, photograph or otherwise that Shaw was the person with a jheri curl. This court can only speculate as to what might have occurred during this testimony if petitioner had cut his hair as requested by his attorneys prior to trial. However, this court is not allowed to speculate as to what impact any of this would have had on the jury. No proof has been offered by petitioner other than that he had short hair at the time of the crime. No proof has been presented that he was not the person in the black trench coat. Petitioner has failed to carry his burden of proof as to this issue and it therefore has no merits.

As to this issue, the petitioner asserts:

Rodney Weatherspoon testified that Kevin Shaw commonly wore baggy pants and sometimes wore a trench coat. He stated that such dress was typical of the Memphis rap band members. To the contrary, he stated that [the petitioner] and the West Memphis group wore t-shirts, Levi's and tennis shoes. . . . Kevin Whitaker testified that Kevin Shaw often wore a trench coat. . . . In addition, there was ample proof that demonstrated that Kevin Shaw approached the car with Carlito Adams and proof that connects that individual with the descriptions of wearing a trench coat and having a jheri curl. (See Statement of the Facts, supra, pp. 4-13).

Although the basis for this argument appears to be the petitioner's claims, otherwise presented in his brief, that he was wearing his hair short and not wearing a black trench coat at the time of the offenses, we are not certain that this is the case. Because of these deficiencies, as well as the fact that the petitioner has failed to direct us to the exact findings he is contesting so that we can review them, we conclude, pursuant to Tennessee Rule of Appellate Procedure 27(a)(7), that this claim is waived.

## II. Denial of Due Process at Post-Conviction Hearing

The petitioner contends that he was not afforded a full and fair hearing on his petition for post-conviction relief, saying that the denial of sufficient funds for expert witnesses and the alleged bias of the post-conviction court prevented his effectively presenting his claims and denied him the opportunity of presenting such evidence to a neutral and detached court, thus violating his right to due process of law. We will address the petitioner's claims.

## A.  Denial of Funds to Complete Social History

As to this issue, the petitioner argues that he was not provided with sufficient funds to obtain necessary services of expert witnesses:

> Given the burdens placed on a post-conviction petitioner pursuant to Tenn. Code Ann. § 40-30-201, *et. seq.* and Tenn. Sup. Ct. R. 28, this denial of the basic services necessary to demonstrate the prejudice that resulted from trial counsel's failure to conduct an investigation into mitigation issues or utilize expert services to develop mitigation themes functionally denied [the petitioner] the "opportunity to present proof and argument."

We will set out the background of this claim.  After the filing of his petition for post-conviction relief, the petitioner, through counsel, requested the services of Dr. Lee Norton, a mitigation specialist with specific expertise in working with trauma victims.  Upon the initial request, the post-conviction court authorized payment for fifty hours of work by Dr. Norton.  A second request was made and the post-conviction court granted the petitioner a total of $5,000 for fifty hours of work at $100 per hour performed by Dr. Norton.  The post-conviction court also granted travel expenses in the amount of $595.  Although the Chief Justice approved the $5,000 for fifty hours of work, he denied the request for travel expenses.  A third request for funds was made several months later for an additional 150 hours of services to be performed by Dr. Norton.  The post-conviction court granted funds in the amount of $15,000 for 150 hours of work and granted $2,524, plus reasonable and necessary expenses, for the travel expenses of Dr. Norton.  Upon review, the Chief Justice denied this payment, authorizing, instead, $4,875 for seventy-five hours of work at an hourly rate of $65 per hour for Dr. Norton's services plus reasonable expenses not to include out-of-state travel.  The petitioner then sought review of the Chief Justice's denial pursuant to Tennessee Supreme Court Rule 13, § 6(b), and the court, with the Chief Justice not participating, found the petition without merit.  Dr. Norton then refused to work for the $65 per hour fee allowed by the Chief Justice.

During the post-conviction evidentiary hearing, Dr. Norton testified that she did not complete her work.  Dr. Woods stated that he was unable to complete his evaluation due to the "incompleteness" of the investigation.  The petitioner contends that the denial of funds resulted in his inability to present proof to establish he was prejudiced by counsel's failure to conduct an investigation into mitigation issues or utilize expert services to develop mitigation themes.  Thus, he argues that he was denied his right to a full and fair hearing.

We disagree with the petitioner's claim that he was denied sufficient funds for the preparation of proof at the evidentiary hearing.  He was granted $5,000 for fifty hours of Dr. Norton's services, at $100 per hour.  The post-conviction court then granted an additional $15,000 for 150 hours of Dr. Norton's services at $100 per hour.  However, the Chief Justice reduced the amount of these additional funds to $4,875 for seventy-five hours, at $65 per hour, a rate which Dr. Norton found unacceptable.  Thus, the "court" did not deny the petitioner funds for expert services.

37

Rather, Dr. Norton refused to work for the hourly rate which had been authorized. The petitioner has failed to establish that he could not employ another mitigation specialist at the $65 hourly rate. We will not assign constitutional error to a "court" when funds were provided but rejected by the one expert selected. Thus, the petitioner has failed to establish that the "court's" denial of funds for Dr. Norton denied him a full and fair hearing.

Moreover, Dr. Norton testified that the scope of her contract with the petitioner's counsel was limited to her assistance in conducting interviews, although she did perform some functions of the traditional mitigation specialist. She considered herself a "consultant" in this case. Dr. Norton acknowledged she was surprised at being subpoenaed to testify as an expert and, had she been aware this would occur, she would have prepared differently. With regard to Dr. Woods's evaluation, he clarified that when he referred to the investigation as "incomplete," he meant it was incomplete with regard to the way that "these things unfold" rather than incomplete due to a "lack of thoroughness." As such, there is no evidence to support a conclusion that Dr. Woods's opinion would have been different had Dr. Norton completed her interviewing process. This issue is without merit.

### B. Post-Conviction Court Exhibited Bias Toward the Petitioner

The petitioner complains that rulings and statements made by the post-conviction court demonstrated the bias of the court and its inability to consider and give effect to mitigation evidence, arguing that the court's actions and comments during the evidentiary hearing exhibited hostility to the concept of mitigation. Thus, according to this argument, the post-conviction court denied him a "full and fair hearing." We will examine the petitioner's specific claims in this regard.

### 1. Evidence that Obra Carter was Mentally Ill

In his brief, the petitioner explains this claim:

During the post-conviction hearing, evidence was presented from several witnesses regarding [the petitioner's] father and his erratic mood swings and his agitated and violent demeanor. During Louise Carter's testimony, post-conviction counsel attempted to introduce testimony regarding Mr. Carter's sleep habits, specifically that he required very little sleep, as a means of demonstrating that Mr. Carter had symptoms of mental illness. The state objected, and the court sustained the objection.

Because of the nature of these claims, we will set out this entire interchange as to Obra Carter's alleged mental illness. Louise Carter was questioned as to Mr. Carter's going out at night:

Q.      And did this ever stop or did this continue on?

A.      It would stop, you know, for a minute and then he'd go back out there. You know, he might stay at home, . . . maybe two nights or three nights and then he'd go

38

back out on the weekend or whatever.

Q.     And when he would be out how long would he stay out?

[THE STATE]: Your Honor, I'm going to object to this. It seems like it's getting not really relevant. We're not dealing with caregivers of the [petitioner].

THE COURT: I'll have to agree. I'm going to sustain the objection.

[POST-CONVICTION COUNSEL]: Well, Your Honor, if I may be heard. This goes to show – I'm getting ready to develop a pattern of Mr. Carter staying out late and not sleeping very often. My mental health experts have advised me that Mr. Carter's sleeping habits is [sic] very relevant to their determination of possible symptomatic problems of mental illness in Mr. Carter. And I believe that they will discuss that when they testify. Sleeping patterns are symptoms –

THE COURT: Well –

[POST-CONVICTION COUNSEL]: Mr. Carter did not require a lot of sleep.

THE COURT: Okay. Neither do I. And I don't know that I have any mental health problems, but that's another question all together. Mr. Carter's mental health issues, what impact is that going to have on [the petitioner]?

[POST-CONVICTION COUNSEL]: Well, Your Honor, obviously the experts are the ones who need to address this. It is my understanding that a lot of mental illnesses have a genetic component.

THE COURT: Is there any proof? Do your experts have any proof? Because up to this point I have heard nothing nor have I seen anything in the record that indicates [the petitioner] has any mental health problems.

[POST-CONVICTION COUNSEL]: Well, Your Honor, I do not have any indication that [the petitioner] suffers from the same mental illness if Mr. Carter does indeed suffer and I do not think that they will be able to go as far as to diagnose Mr. Carter with a mental illness. They will be able to discuss behavioral symptoms that Mr. Carter exhibits and a lot of those deal with the way that Mr. Carter

39

treated [the petitioner] on occasion. And we are going to be exploring that in depth today during testimony.

[THE STATE]: Your Honor, I object. I think this is getting absolutely ridiculous. Here's a person who by all accounts says he doesn't have a mental illness. Nobody says that [the petitioner] has a mental illness. The testimony yesterday was that Mr. Carter had very little impact with [the petitioner]. And apparently Mr. Carter has never been diagnosed with a mental illness and we're going to extrapolate behavior based on whether or not he sleeps a lot at night and somehow put that on to [the petitioner]. I mean this is the kind of stuff that just gets absolutely beyond the pale of reason. I mean we're at the point now where we're just kind of grasping at straws. And I think the Court has to look at it from the standpoint of reason and is this reasonable testimony, is it relevant testimony, and what we're trying to do now is bootstrap a bunch of stuff without really any proof.

THE COURT: Well, that's my concern to be honest with you because that was one of the things I was really interested in yesterday. And we paid particular attention to and I think we inquired of Mrs. Burns the lack of contact between Obra Carter and [the petitioner], the very minimal contact between the two. And I can see some relevance if you were going to show from a genetic standpoint that Obra Carter has some mental illness and we can show that [the petitioner] has a mental illness and you can connect the two and as a result his actions were such. But to this point from what I've read in the file and what I've seen and heard [the petitioner] has no mental illness. So whether Obra Carter has a mental illness or not I don't see the relevance of that. And frankly, you know, his sleeping patterns – that may be a new one that I haven't heard yet from a mental health expert.

[POST-CONVICTION COUNSEL]: Well, Your Honor, if I may. First of all, I believe the testimony yesterday indicated that Mr. Carter had very little contact with [the petitioner] as compared to a father who lived in the home. However, that does not mean that Mr. Carter had very little impact on [the petitioner]. And I think you will see through the rest of the testimony from his siblings and some of Mrs. Carter's children that [the petitioner] in his later teenage years developed relationships with some of Mrs. Carter's children with Mr. Carter and spent some time over in their home, number one. Number two, the way that Mr. Carter did interact with [the petitioner] when he was available to [the petitioner] and the manner in which that contact occurred is very relevant because the impact was very great. And I

40

believe that the mental health experts who will testify later will explain that in more detail. Number three, I said that – I just want to clarify this for the record. I said that it is not our contention that [the petitioner] suffers from the same mental illness as Mr. Carter if Mr. Carter suffers from any. He doesn't exhibit the same symptoms as Mr. Carter. However, only the mental health experts will be able to diagnose [the petitioner], whether or not he has a mental illness. I wouldn't want to go there at this point.

THE COURT: Well, I'm not convinced that this is relevant. And I haven't heard anything in your argument that convinces me that it's relevant. And so I'm going to sustain the objection.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). Here, the post-conviction court disallowed testimony as to the sleeping habits of Obra Carter, concluding there was no evidence either that Carter or the petitioner had a mental disease. The court further found that Obra Carter had little influence upon the petitioner's life as the proof introduced at the hearing strongly indicated that Carter had limited contact with the Burns children. However, the post-conviction court permitted counsel to make an offer of proof as to this issue. In this regard, Louise Carter testified that Obra Carter would "[s]ometimes . . . stay out all night long. Sometimes he would come in at a reasonable hour." She explained that, if Carter came home at a "reasonable hour," he "might watch a little television" before going to bed. She said that Carter sometimes went to work without getting any sleep at all. The petitioner asserts that "a decreased need for sleep" is "[o]ne of the criteria for a manic episode . . . necessary for a diagnosis of bipolar disorder." (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 362 (4th ed. 2000). While that may be, the fact remains that the petitioner tries to tie together a series of tenuous arguments to construct this claim. We agree with the post-conviction court that this testimony was not relevant.

Furthermore, as noted by the State, the post-conviction court allowed evidence of Obra Carter's nocturnal behavior through the testimony of Dr. Norton. She interviewed Zettie Thomas, Obra Carter's first wife, who said that he often stayed out until 2:00 or 3:00 a.m. Accordingly, we conclude that the petitioner failed to establish that the post-conviction court was biased against him or refused to consider mitigation evidence.

### 2. Obra Carter's Violence Toward the Petitioner's Siblings

At the post-conviction hearing, the petitioner's sister, Robin Burns, testified that their father, Obra Carter, "whip[ped]" them for leaving the house or playing with the neighbors. She defined the "whippings" as Carter striking the children's legs or arms with a switch or, sometimes, a belt. The following exchange then occurred:

41

Q.     And where on the body would he strike you when he used a belt?

A.     The same.  Legs or arms.

Q.     Did he ever strike you on the back?

A.     Not that I can recall.

Q.     Would you please describe for the Court the worst time that you remember your father whipping you?

[THE STATE]:  Your Honor, I'm going to object to relevance.

THE COURT:  Sustained.

[POST-CONVICTION COUNSEL]:  Your Honor, [the petitioner] was living in the household.  This is his father's method of disciplining his children.  I think that that directly goes to his background.

[THE STATE]:  First of all, Your Honor, she's asking her the worst spanking she ever got.  And I don't see the relevance of that to [the petitioner].  And if the extent of the spankings were a switch on the legs I really am having a difficult time seeing the significance or the relevance of that.  So I don't really see the relevance of the worst spanking that she ever got unless you can tell me what impact that had on [the petitioner] and why that's relevant.

[POST-CONVICTION COUNSEL]: May I have just a moment, Your Honor?

THE COURT:  Sure.

[POST-CONVICTION COUNSEL]:  Your Honor, if I may the incident that I'm referring to and asking Ms. Burns to describe is one in which Ms. Burns was so afraid of her father in anticipation of the whipping that she wet her pants when she was 13 years old.  I think that that definitely goes to the degree of the whippings that Mr. Carter inflicted upon his children and the fear that that invoked.

THE COURT:  Well, again, . . . I'm not questioning what was in this child's mind under those circumstances.  But from what I have heard and you've presented me nothing so far that I have heard that these are

42

severe beatings. These are spankings with a switch. Not, you know, my definition of a spanking with a switch and your definition of a spanking with a switch may be two different things. So far I've heard these children testify that Mr. Obra Carter spanked them with a switch. The reasons for the discipline and the degree of discipline and the severity of the beatings, I haven't heard any testimony of abuse. I heard testimony of spankings with a switch. I don't know of too many children in anticipation of getting a spanking with a switch that look forward to it. I don't know too many children that I've heard of that would eagerly await that if they're told you're going to get a spanking when your father gets home or you're going to get a spanking when your father gets here. That's not an indication of a beating. I haven't heard that. And I really am struggling with the significance or where we're going with this. And again you know I don't see the relevance of that.

[POST-CONVICTION COUNSEL]: Well, Your Honor, if I may. The relevance is that these children only have this father's whippings to put anything into context. The experts will testify that [sic] the reaction of the children to their father's beatings.

THE COURT: Beatings? Where do you get the term beating?

[POST-CONVICTION COUNSEL]: They were whipped with a switch to the point that they were so afraid that a 13 year old wet her pants, Your Honor. I think that that indicates the severity and I believe that the experts will tie that in and will be able to address the trauma that goes into a 13 year old's loss of control of her bladder.

[THE STATE]: Your Honor, the only problem – that's compounding the problem. The other witnesses['] testimony doesn't go to establish that this was a violent household. In fact if I remember some of the testimony when asked about Obra Carter one of the kids – I forget which one. They didn't say he was violent. And I didn't get the impression from Ms. Leslie Burns he was violent.

THE COURT: I hadn't heard any testimony that he was violent. I heard testimony that he spanked his children with a switch. Not on the back, not on the head. On the backs of the legs. Again I mean we may be living in a different world but I'll be honest with you with all due respect in the world that I grew up with a spanking with a switch on the back of the legs was not abnormal. It was not considered child abuse. It was not considered a beating. It's not a tree limb. It was a

switch. They've all described it as a switch. They've all described it as switches on the legs. Which I'm really struggling with that as a severe beating or something that is traumatizing. And to be honest with you I'm kind of curious to listen to these experts that are going to tell me that that is a traumatizing thing other than a normal trauma type thing for a child anticipating a spanking or getting a spanking.

[POST-CONVICTION COUNSEL]: Well, I believe the experts will explain that in great detail about what those kinds of reactions indicate in children.

THE COURT: Well, again, and this is no disrespect to this young lady. I don't mean in any way to disrespect her. Her reaction and her fear of her father anticipating a spanking, I don't see the relevance of that as it applies to [the petitioner]. Her thought processes with regard to Obra Carter, I don't see how that impacts [the petitioner]. I don't know. It would be another thing if I were listening to proof of Obra Carter being this person who was around all the time and abusive and doing things that traumatized [the petitioner]. Or [the petitioner] was aware and saw that. I haven't heard any of that. And so to the extent of where we are right now I don't see the relevance of this. Of a particular incident where this young lady had an embarrassing moment as a result of that. You know, so I'm going to sustain the objection. I just fail to see the relevance of it.

As noted by the State, the post-conviction court heard evidence of the "whippings" by Obra Carter, for Renita Burns, Robin Burns, Phillip Carter, and Steve Carter all testified about his "whipping" them. Relying on Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S. Ct. 869, 878 (1982), the petitioner contends on appeal that "[e]vidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation." In our view, the post-conviction court admitted such testimony, doing so through other witnesses. The petitioner has failed to establish that the post-conviction court's ruling with regard to Robin Burns wetting her pants or describing her "worst" whipping was relevant. We conclude that the post-conviction court did not abuse its discretion in this evidentiary ruling.

### 3. Bias Against Dr. Norton

The petitioner argues that "[t]he post-conviction court's colloquies during Dr. Norton's testimony further demonstrate its hostility to mitigation." Additionally, he asserts that "[t]he post-conviction court . . . grilled Dr. Norton on what she meant by an environment of fear and demanded her to break down the atmosphere between the Burns household and the Carter household." We will set out how this matter developed at the hearing.

Dr. Norton testified that, in her opinion, Obra Carter abused Zettie Thomas, Louise Carter, and Leslie Burns, saying that "the climates in both households primarily toward the father was that of trepidation, anxiety and fear." She continued that a child's witnessing of abuse of his or her mother "can cause tremendous traumatic reactions in children," adding that for children to "live in an environment of fear would be a very detrimental factor that can cause serious consequences to their development." The post-conviction court questioned Dr. Norton as to her definition of "environment of fear," asking that she differentiate between the Burns and the Carter children in her responses. She responded there was no difference between the Carter children, with whom Obra Carter resided, and the Burns children, with whom Obra Carter visited intermittently.

During the arguments on this matter, which precipitated a request from post-conviction counsel for a continuance of the hearing so that the transcripts of testimony of certain witnesses could be prepared and then reviewed by Drs. Norton and Woods to respond to questions from the post-conviction court, the court denied the request, clarifying the information the court was seeking from Dr. Norton:

> I'm going to deny the request. And I think your experts can still testify. The only thing I'm asking [Dr. Norton], and you know, maybe she can't tell me the answer. I don't know. There is a difference to this observer in the Carter family and the Burns family. I feel completely different. Two separate households. I've got maybe one gentleman who[]se called the head of the household, but I've got two separate families. And one family lives with [Obra Carter] 24 hours a day 7 days a week. One family sees him for 30 to 45 minutes twice a month. There's a totally different – there's got to be a totally different atmosphere and environment to me. Dr. Norton may tell me that's not true. That's just not true. Based on the testimony that I've heard in the courtroom from the Burns family and from the Carter family there's a totally different environment. The Carter family lived with this daily. And if they didn't make the bed or if they thought or if they were out of the yard or whatever, these were the rules and they were going to get a spanking. And it may have been on a daily basis or once a week or five times a month or whatever. The Burns family on the other side said the only thing I've heard that they got a whipping for was being out of the yard when Obra came by. And Obra didn't come by very often, but when he came by he expected all the kids there. And if they weren't the[re] they got a whipping. And there's a difference there to me when she uses the term "the children" grouping them all together. The Burns children and the Carter children saying they lived in a climate of fear because of the type of person Obra Carter was. I have a problem with that. And I'm trying to get her to tell me if there's a distinction between the Carter kids and the Burns kids.

The petitioner concludes his argument as to this issue by asserting that "[t]he assumption that Obra Carter can be considered the head of a house in which he does not now and has never resided is contrary to both law and logic. *Cf.* 26 U.S.C. § 2(b) (a head of a household must reside therein)." We do not understand the relevance of the petitioner's reference to the Internal Revenue Code. The

proof was, as we have set out, that Obra Carter spent the large majority of time with the children he had with his wife and saw only intermittently those, including the petitioner, he had with Leslie Burns. Rather than an exhibition of bias, it would appear logical for the post-conviction court, in assessing Dr. Norton's testimony, to determine whether Carter's treatment of his children, including the petitioner, had the same effect on those with whom he spent very little time. As to this issue, the petitioner has presented only argument, but no authorities, supporting his view that a court's seeking clarification can be an exhibition of hostility toward a witness.

We conclude that this issue is without merit.

### III. Denial of Due Process at the Petitioner's Trial

The petitioner contends his right to a fair trial was violated by jury misconduct because the jury foreman recited a Bible verse during deliberations and the jury considered the potential sentencing during the guilt/innocence phase of deliberations. We will review these claims.

The petitioner alleges "the jurors in his case consulted extra-judicial materials – a Bible," explaining that the jury foreman brought a Bible into deliberations and "used" a Bible verse to ease "another juror's concern that if she voted to convict [the petitioner], and thereby sentence him to death, God would never forgive her." The State responds that this issue is waived because the petitioner did not present it on the direct appeal of his convictions; and, if considered on its merits, the claim fails because there is insufficient evidence that the jury consulted extraneous materials during deliberations. The waiver argument cannot be presented by the State for the first time on appeal for, as explained in Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005), "the State's waiver argument has itself been waived. Issues not addressed in the post-conviction court will generally not be addressed on appeal."

In our review, we first will set out the post-conviction hearing testimony of jury foreman Lloyd Davis. He said that at the trial he had a Bible with him and during deliberations "recited" a verse to another juror:

Q    [Did] you have that Bible with you in the jury room during the jury deliberations?

A    Every day.

Q    And at some point during the jury deliberations did you have occasion to cite certain Bible verses to the jury?

A    Yes, I did.

Q    Do you recall what Bible verses were cited, Mr. Davis?

46

A       I don't believe I recited but one. . . .   That was in Isaiah. . . .  I wouldn't know the verse, the chapter or the verse.  I just know what it says.

Q       Do you remember the contents of the verse?

A       Yes, it was about God was telling that his thoughts were not our thoughts, and his ways were not our ways.  Something like that.

Davis then explained that he recited the verse to the juror because she had expressed religious concerns about deciding guilt or innocence: "[S]he just stated something about God wouldn't want her to . . . make a certain decision . . . [and] wouldn't allow her to make her decision to give somebody the death penalty . . . ."  The State then objected to further testimony about the jurors' "internal communications," asserting that "the rules of evidence are very clear that jurors cannot testify about what they do in the jury room . . . ."  The court sustained the objection but allowed the petitioner's counsel to continue questioning to preserve the issue for appeal.  It is the testimony of Mr. Davis during this proffer upon which the petitioner bases his claim that the jury improperly considered punishment during the guilt/innocence phase.

In issuing its order denying relief, the post-conviction court found that the "reciting" of a Bible verse was not prejudicial to the petitioner:

This court does not believe that asking for divine intervention and comfort from God during the deliberation process is what was meant or intended as outside influence. We ask jurors to make life and death decisions and many jurors look to God for guidance in their everyday life and the daily decisions, which they face.  This Court fails to see how asking God to help a juror make the right decision violates [the petitioner's] right to a fair trial.  Frankly, this Court takes great comfort in the fact that before a jury would make such a monumental decision that they would seek guidance from God.

Tennessee Rule of Evidence 606(b) limits the circumstances under which jurors may be questioned about their deliberations:

(b) Inquiry Into Validity of Verdict or Indictment.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a

47

matter about which the juror would be precluded from testifying be received for these purposes.

The commentary to this rule sets out the circumstances to which this subsection is applicable:

> After verdict, part (b) would come into play. A juror may testify or submit an affidavit in connection with a motion for new trial, but only in the limited circumstances of:
>
> (1) "extraneous prejudicial information" finding its way into the jury room,
>
> (2) improper outside pressure on a juror, or
>
> (3) a quotient or gambling verdict.

In sum, the pertinent part of Tennessee Rule of Evidence 606(b) provides that a juror may not testify "to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict," but is allowed to testify "whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror . . . ." Tenn. R. Evid. 606(b). In Walsh, 166 S.W.3d at 646-47, the Tennessee Supreme Court addressed the application of Rule 606 in a case where a juror testified about the mental and emotional effects of a deputy's statement to the juror during deliberations that she "had to" make a decision. The court concluded that Rule "606(b) permits juror testimony to establish the fact of extraneous information or improper influence on the juror; however, juror testimony concerning the effect of such information or influence on the juror's deliberative processes is inadmissible." Id. at 649.

Additionally, according to Walsh, once the petitioner proves "a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." Id. at 647 (citing State v. Blackwell, 664 S.W.2d 686, 689 (Tenn. 1984)).

As we will explain, we conclude, as did the post-conviction court, that the petitioner failed to establish that the jury at his trial was exposed to extraneous prejudicial information. While Davis responded "[e]very day," when asked if he had a Bible with him in the jury room during deliberations, he was not asked if he displayed the Bible to the other jurors or whether they even were aware that he possessed it. Likewise, although he said that he "believe[d] [he] recited" only one Bible verse, he described it as "[t]hat was in Isaiah . . . I wouldn't know the verse, chapter or the verse. I just know what it says," and was not asked if his knowledge of the verse was more precise at the time of the jury deliberations. Additionally, although saying that he "recited" the verse, he was not asked whether he had read the verse from his Bible, quoted it verbatim, paraphrased it, simply

gave the gist of it, or whether he even had identified the verse as being from the Bible.[1] Thus, we conclude that the petitioner has failed to make an initial showing that, in the language of Rule 606(b), "extraneous prejudicial information was improperly brought to the jury's attention" so as to create a rebuttable presumption of prejudice and shift the burden to the State "to explain the conduct or demonstrate that it was harmless." See Walsh, 166 S.W.3d at 647. Accordingly, the additional questions asked Davis, which the petitioner claims show that the jury improperly considered the verdict during the guilt phase of the trial, were properly disallowed by the court as not being permitted by Rule 606(b).

### IV. State's Use of Conflicting Theories at Codefendant's Trial and Perjured Testimony Violated the Petitioner's Rights to Due Process and a Fair Trial

The petitioner argues that the State denied him a fair trial by "the use of conflicting theories between the [petitioner's trial and codefendant Garrin's trial] and the knowing use of perjured testimony." To support this claim, he inserted in his appellate brief charts containing excerpts from the testimony of Eric Thomas in the trials of the petitioner and of Derrick Garrin, asking that we "review" this testimony and conclude that it proves his claim.

In our consideration, we first note that the petitioner was convicted of two counts of felony murder for the shooting deaths of Damond Dawson and Tracey Johnson, but his convictions for the attempted murders of Eric Thomas and Tommie Blackman were reversed, this court finding that attempted felony murder is not a criminal offense. Thus, it is unclear as to how the issue of inconsistent theories as to who shot Eric Thomas is relevant to the petitioner's convictions for the first degree murders of Damond Dawson and Tracey Johnson. The petitioner attempts to make this connection by arguing that "[t]he State wanted to show that the person on trial was the most culpable, and, therefore, the most deserving of the death penalty." However, he makes no references to the record to support this theory.

In codefendant Garrin's trial, according to the petitioner's chart, Eric Thomas testified that he was shot by "[t]he big fellow with the glasses," the petitioner asserting that "[t]he record in the case is clear that [sic] big fellow with glasses is Derrick Garrin." However, he does not identify where in the appellate record, which consists of transcripts of testimony in two boxes, the information establishing this clarity can be located. Further, he asserts that "[t]he record is clear, including from the statements of Adams and Shaw to the police, PC Exhibits 7 and 8, that Kevin Shaw was with Adams when Adams first approached the car." He does not explain how we can make this determination solely from the confusing statements of these witnesses. He makes no references to the record as to questioning trial counsel or any other witnesses as to why Eric Thomas was not cross-examined in the way he believes should have occurred.

---

[1]Based upon this analysis, we distinguish the facts of this case from those in State v. Harrington, 627 S.W.2d 345, 350 (Tenn. 1981), where our supreme court determined it was error for the jury foreman to read passages to other jurors during their deliberations to "buttress" his belief that the death penalty should be imposed.

Additionally, the petitioner claims on appeal that the Shelby County District Attorney's Office suborned the perjured testimony of Eric Thomas:

> This is the intentional use of perjured testimony. There can be no question that Eric Thomas' alternative descriptions of the person who shot him involved perjury. Nor can there be any question that the State's attorneys were aware of the perjury.

We disagree with the petitioner's claims that he has shown the State suborned perjury by Eric Thomas or even established that Thomas perjured himself. Again, we note that it is difficult for this court to review issues where, as here, we are referred broadly to documents and not to the specific portion which, he claims, supports his accusations of subornation of perjury. The statement of Kevin Shaw consists of six pages and, by our reading, does not support the petitioner's claims. As we understand the statement, Shaw said that, upon hearing two shots, without identifying who fired them, he turned and ran, as "Kevin and Derrick" apparently ran up to the car. Shaw said, "I ran down the street. I heard a whole lot of shots after that as I was running down the street." In his statement, Carlito Adams said that he and Shaw approached the driver's side of the vehicle occupied by the victims and both began running as shots were fired, the first shot being fired by the man wearing "the big black nylon 3/4 jacket."

The post-conviction court found that no proof had been presented as to the petitioner's conflicting theories claim and, thus, it was without merit:

> The next allegation by Petitioner is that the State's action denied him a fair trial and appeal. He first argues that the State had alternative theories of prosecution in the three separate trials. No proof has been presented as to contradictory theories by the [S]tate in the trial of the co-defendants. The petitioner admitted he was present on the scene armed with a gun and that he fired his gun. The testimony presented was that 5 or 6 people participated in this killing. At least 4 or 5 of them were armed. Several were identified as firing shots into the car containing the victims. The petitioner was identified by several witnesses as being "a shooter." No alternative theories were offered by the State as to Petitioner's role based upon what proof was presented to this Court. Since no proof has been presented regarding alternative theories[,] this issue has no merit.

In his appellate brief, the petitioner has neither acknowledged nor addressed this specific finding, nor has he made any references to the transcript of the evidentiary hearing as to whether his trial counsel, or any other witnesses, agreed with his claim that the State pursued differing theories in the two prosecutions. We conclude that the record supports the findings of the post-conviction court.

## V. Ineffective Assistance of Counsel

On appeal, the petitioner claims that trial counsel failed to function as effective counsel, arguing that they:

A. Failed to thoroughly investigate and present evidence regarding the lesser culpability of the petitioner;

B. Failed to competently select a jury;

C. Failed to object to the presentation of victim impact evidence;

D. Failed to utilize the services of various experts exacerbating deficiencies in the mitigation investigation;

E. Failed to thoroughly investigate and present sufficient mitigation evidence; and

F. Failed to prepare defense witnesses to testify.

We will examine these claims.

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment.'" Gideon v. Wainwright, 372 U.S. 335, 340, 83 S. Ct. 792, 794 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465, 62 S. Ct. 1252, 1257 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S. Ct. 1708 (1980); McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14 (1970); see also Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S. Ct. at 2064; Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

51

Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; see also Combs, 205 F.3d at 277.

The performance prong of the Strickland test requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." 466 U.S. at 690, 104 S. Ct. at 2066. "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278 (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2055). Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n.38, 104 S. Ct. 2039, 2050 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Id. at 785, 107 S. Ct. at 3121.

If the petitioner shows that counsel's representation fell below a reasonable standard, then he must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838, 844 (1993) (citing Strickland, 466 U.S. at 687, 104 S. Ct. at 2064). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. Nichols, 90 S.W.3d at 587. That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. Nealy v. Cabana, 764 F.2d 1173, 1178-79 (5th Cir. 1985). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). Moreover, when challenging a death sentence, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" Henley, 960 S.W.2d at 579-80 (quoting Strickland, 466 U.S. at 695, 104 S. Ct. at 2069).

We will examine the petitioner's specific claims as to ineffective assistance of counsel.

## A. Failure to Investigate

### 1. Guilt Phase

The petitioner does not direct this court to the specific portions of the post-conviction court's findings of fact and conclusions of law which he challenges by this claim. As to this issue, he argues that trial counsel failed "to establish [the] relative culpability of the participants." He says that this issue "was made more acute by the fact that two of the participants, including Kevin Shaw [and] Benny Buckner . . . were never charged at all." Additionally, the petitioner argues that counsel erred in deciding to "simply rely on [the petitioner]" to present his defense that "although [the petitioner] was present that day and had fired his gun, he never approached the victims' car and never fired into the car." He argues that "[f]rom a simple review of those transcripts and the other records, [trial] counsel could have, as post-conviction counsel has done, determined that [the petitioner] was not the Kevin who approached the victims' car initially with Carlito Adams. Rather[,] it was Kevin Shaw." To establish the certitude of this claim, the petitioner directs this court to review pages four through ten of his "Statement of the Facts."

Additionally, the petitioner argues that although trial "[c]ounsel acknowledged that [the petitioner] had insisted that he had short hair at the time . . . [trial counsel] ignored this insistence[,] choosing to believe that [the petitioner] had always had a jheri curl." He continues this argument by saying that counsel "never investigated and never interviewed friends or family about his hair style [sic] nor did they interview Mary Jones, the woman who lived across the street from the Dawsons and claimed to have seen the shooting, about the specific descriptions of individuals she had seen." The petitioner recounts testimony presented at the post-conviction hearing as to his hair length, asserting that "[b]y failing to take more seriously [the petitioner's] insistence that his hair had been short at the time of the incident and that witness Mary Jones had mistaken him in the courtroom for Kevin Shaw at the scene and investigate accordingly, trial counsel's representation was both below the required standard of performance and was prejudicial to [the petitioner]."

As to the claim that trial counsel did not investigate and attempt to garner proof of the petitioner's hair length at the time of the offenses, the post-conviction court found:

> Petitioner again raises the issue about the length of his hair. This court has reviewed the trial transcript, the portions of other trial transcripts, witness and codefendant statements. The petitioner was present on the scene and he was described as wearing a long black trench coat. No one else on the scene, to the best of this court's recollection, was so dressed. Mr. Thomas picked out the petitioner's photograph even with short hair. Ms. Jones identified the petitioner by face and by the long black trench coat he was wearing. She also described his hair as a [j]heri curl. Trial counsel knew pre-trial that Thomas had identified Petitioner's picture and they testified that their picture of [the petitioner] looked very similar to the one in the

line-up. It appears to the court that Ms. Jones, who testified later, had not made identification prior to trial. At trial she made an in court identification on cross-examination of the petitioner which appears to have been fully unexpected by the State or the defense. The petitioner had admitted being present on the scene, with a gun, and firing some. Thomas had identified him even with short hair. Up until that point this court is not sure that there was an issue about the length of petitioner's hair. Only when Ms. Jones described petitioner as the person with the black trench coat and jheri curl and the person she identified in court with a jheri curl, did his hair length become an issue. Again, this court is asked to speculate as to who else on the scene had a jheri curl. Petitioner implies Kevin Shaw but offered no proof by witness, photograph or otherwise that Shaw was the person with a jheri curl. This court can only speculate as to what might have occurred during this testimony if petitioner had cut his hair as requested by his attorneys prior to trial. However, this court is not allowed to speculate as to what impact any of this would have had on the jury. No proof has been offered by petitioner other than that he had short hair at the time of the crime. . . . No proof was presented that he was not the person in the black trench coat. Petitioner has failed to carry his burden of proof as to this issue and it therefore has no merits.

We agree with the post-conviction court that the testimony at the hearing does not support the petitioner's assertions that trial counsel did not attempt to show he had a shorter hairstyle at the time of the incident. Senior trial counsel explained that the petitioner was unable to name any witnesses who would say that he did not have a jheri curl at the time:

Q       And do you recall whether he asked you to find witnesses that could describe his hair length?

A       I do and I think we – he couldn't give us anybody who could say that they saw him with a normal haircut at the time that this incident occurred or we would have called them, but what he did do was he gave us a photograph depicting him with short hair or a nonjheri curl hair, but that photograph appeared to be of a much younger Kevin Burns and not Kevin Burns at the time of this incident.

        And as matter of fact, to us it looked almost identical to the photograph they used for the witnesses in the photo lineup to be identified that they did in fact pick out. So we thought if we tried to use that photograph, it would only strengthen the case's I.D., since that photograph was similar to the photograph that was in evidence. But . . . my recollection was he could not give us a name of anybody who could say that he did not have that jheri curl at the time of this incident.

Counsel told of his efforts to persuade the petitioner not to wear his hair in a jheri curl at the time of trial:

Q       And in terms of the time of the trial when you met before – when you met [the petitioner], what was his hair length at that time?

A       It was a jheri curl style hair, and it was long, and it aggravated me. We had words about it, and it was my preference that he change his hairstyle for trial and it didn't have anything to do with identification and that. I thought that his appearance was not conducive for something this serious, and I tried to get him to change his hairstyle, and he refused to do so.

Q       Do you recall him advising you why he refused to change his hairstyle?

A       He just simply said I like it, and I won't change it, and that is what he said the entire time. I even got his parents involved in that process trying to talk to him about that hair.

Junior trial counsel described their attempts to convince the petitioner he should not wear his hair in a jheri curl at the time of trial:

Q       Do you remember why he refused to cut his hair?

A       He just wouldn't cut it. We begged and pleaded with him to cut it because that was one of the issues in the trial that Ms. Jones was talking about this fellow had a jheri curl.

During cross-examination, junior counsel further detailed their dealings with the petitioner and his hairstyle:

Q       He had a jheri curl in the courtroom at trial?

A       Right.

Q       And you and [senior counsel] tried to get him not to have a jheri curl at trial?

A       Yes, very much so.

Q       And the reason you did that was because the description of him involved a jheri curl?

A       Exactly.

Q       From Ms. Jones?

A       Yes.

55

Q      Did he tell you that he had a jheri curl on the day of the crime?

A      No, not that I remember.

Q      Did he give you the name of anybody that could prove he didn't have a jheri curl at the trial?

A      No.

Q      Okay. Explain that to me. What exactly happened? What was the interaction between you and [the petitioner] about this hairstyle?

A      This hairstyle when I first met him I believe that he had already had the start of a jheri curl, and I say start, but it was pretty long. He'd already doing [sic] the process or whatever it takes. I don't know what all it takes to keep a jheri curl, but he already had it, but one of the issues that came up during our investigation was, like I say, Ms. Jones says the person that done the shooting had a jheri curl.
       And out of all the guys, Derrick Garrin, nobody else had a jheri curl except [the petitioner]. Because I remember making a comment to him back when he had this nobody else was wearing jheri curls in this community. I mean the jheri curl was like the afro. It had died and gone away, but he was sitting in the jail with a jheri curl with all the grease on his shoulders and stuff. It was shining and glistening and stuff, and we kept saying cut your hair, Kevin, get your hair cut. No, I'm not going to cut my hair, and he didn't cut his hair.
       So I mean that was one of the things – we didn't have anybody from him that says he was bald headed at the time of the commission of the offense.

Q      And you-all attempted to find somebody?

A      We didn't find anybody.

Q      You couldn't find anybody?

A      No.

Q      He couldn't give you anybody?

A      No, he always had hair from what I seen. He had hair. I mean he can come back now and say he was bald headed, but he had hair. I think – we even had a picture that was so closely related to the way he actually was during trial, that we couldn't even use that. I think that picture came from an arrest around about that same time. He had hair.

56

Q       He never really gave you a reason why he wouldn't cut his hair?

A       No, he didn't, and I thought that was one of the most – it was a bad thing.  As simple as cutting your hair, which may or may not be able to help you in the course of saving your life, and he wouldn't do it.

Q       Did you ask his mom to maybe talk to him about it?

A       I think we talked to everybody about that.  It was out of style.  It was out of character.  It wasn't what we needed as far as trying to save his life for him to be sitting there behind us with a jheri curl.

On appeal, the petitioner fails to acknowledge the difficult position in which he forced trial counsel by requiring they contend that, while he had a jheri curl at the time of trial, he had not worn his hair in that style at the time of the offenses.  In fact, if the petitioner's claims as to his changes in hairstyle are true, this would appear to be the very unique situation in which a person charged with an offense changed his hairstyle by the time of trial to more closely match the description of the offender, rather than vice versa, which is the norm.  We conclude that the record supports the findings of the post-conviction court.

Although he concedes that trial counsel recognized the importance of establishing whether he was in fact the shooter who killed one of the victims or merely was present, the petitioner asserts that counsel failed to utilize the testimony of Eric Thomas from Garrin's trial to rebut evidence establishing the petitioner as the shooter.  He argues that evidence of his lesser culpability and the fact that his codefendants received lesser sentences were an essential part of the circumstances of the crimes.  Additionally, he argues that counsel's failure to investigate this issue led to a series of missed opportunities to cross-examine the State's witnesses and raise doubt as to whether the petitioner shot at the victims inside the vehicle.

At the petitioner's trial, the proof, as recounted by our supreme court, established that the petitioner and Carlito Adams walked up to the passenger side of a car in which four young men, Dawson, Johnson, Thomas, and Blackman, were sitting.  Burns, 979 S.W.2d at 278.  Adams pulled out a handgun and told Blackman to get out of the car.  Id.  When he refused, the petitioner pulled out a gun and went around to the driver's side of the car.  Id.  Blackman exited the car and fled.  Id.  Adams said, "Get him," evoking the emergence of three or four men from behind hedges.  Id.  These men fired at the fleeing Blackman.  Id.

Mary Jones testified that she saw Carlito Adams shoot Johnson in the chest and identified the petitioner as the person who shot Dawson several times.  Id.  She unequivocally identified the petitioner, explaining that she got "a real good look in his face" as he ran toward her after the shootings.  Id.  Eric Thomas, a surviving victim of the gunfire, made a photographic identification of the petitioner two days after the incident.  Id.  Although acknowledging that he had initially

57

identified Adams as his shooter, Thomas explained that he thought he was going to die and Adams was the only name he knew. Id.

In the direct appeal of this matter, our supreme court described the petitioner's statement to FBI agents regarding the crimes:

On June 23, 1992, Burns was found in Chicago and arrested. After being advised of his rights and signing a waiver, the defendant gave a statement in which he admitted his role in the killings. He said that he had received a telephone call from Kevin Shaw, who told him that four men had "jumped" Shaw's cousin. Burns, Shaw, and four others intended to fight the four men, and Shaw gave Burns a .32 caliber handgun. As the others approached a car with four men sitting in it, Burns stayed behind. He heard a shot, saw a man running across the yard, and fired three shots. He then left the scene with the other men.

Id.

At the post-conviction hearing, Mary Jones said the shooter of Damond Dawson was the person with a shoulder-length jheri curl and wearing a long black trench coat. She described Tracey Johnson's shooter as "a brown-skinned guy, tall, . . . about six-two, six-three, weighed about 250 pounds," and identified the petitioner as the assailant sporting the jheri curl.

Trial counsel testified that the petitioner had severely limited his options by providing a statement to FBI agents in Chicago where he was arrested, admitting to them that he was present at the scene, had a weapon, and fired shots. Junior counsel said the theory of defense rested upon the petitioner's assertions that he had fired into the ground or air, did not know the victims, and was not culpable. Although a main focus of the defense was to challenge the eyewitnesses' identification, senior counsel recalled that "nine out of ten people said [the petitioner] was the trigger person." Further, Investigator Mull talked with one of the codefendants who specifically implicated the petitioner as the trigger person. In this regard, senior counsel noted that the best proof to establish his defense that the petitioner was not the shooter was going to come from the testimony of the petitioner himself. However, on the day the petitioner was to testify, he refused to take the stand, which greatly impacted the defense strategy.

Senior counsel acknowledged that Eric Thomas identified Derrick Garrin as his shooter and described the other perpetrator as "five-eight, slim build, dark complexion, curl-like fade." Senior counsel said this description matched the petitioner. Eric Thomas' identification of his shooter changed at the petitioner's trial, and both senior and junior counsel recounted that they attempted to impeach his testimony. Senior counsel said that, while there was not "one hundred percent consistency among the witnesses and victims," there was a consistency in that the petitioner was not one of the first people to arrive at the car. Senior counsel further found the information that Carlito Adams did not know the petitioner by name not particularly useful because Adams had also

implicated two individuals he did not know as the shooters. Counsel added that all of the codefendants, with the exception of Derrick Garrin, identified the petitioner as the trigger person.

At the post-conviction hearing, the petitioner presented the testimony of various witnesses who said that he did not have a jheri curl at the time of the offenses. Kevin Whitaker testified that, in 1992, Kevin Shaw wore his hair "kind of like a high top, kind of like a high-top fade type of deal" and often wore a trench coat. Whitaker said that the petitioner wore his hair "low on the scalp." Samuel G. Brooks testified that he could not recall the petitioner wearing a "jheri curl," but the last time he saw the petitioner was in March 1992. Rodney Weatherspoon testified that Kevin Shaw "sometimes" wore a trench coat, adding that the people from West Memphis wore their hair in fades, while those from Memphis had "chemical processes" in their hair. He described Kevin Shaw as having "bushy hair," "longer hair" with "the little curl." Weatherspoon stated that he never saw the petitioner with long hair or a jheri curl. The petitioner's mother, Leslie Burns, who testified at the petitioner's trial, said that the petitioner wore his hair short at the time of the incident and did not start growing his hair long until after his arrest. She said she saw no reason for her son to change his hairstyle for trial. Renita Burns said that the petitioner never wore his hair long or used chemicals in his hair. Steve Carter said that the petitioner "always kept short hair." George Michael Hissong said that the petitioner wore his hair short.

The post-conviction court found that trial counsel had not been ineffective in their preparation for the guilt phase of the trial:

Petitioner alleges that counsel failed t[o] interview witnesses to the crime. Both attorneys testified that their investigator attempted to locate and talked to witnesses. Tomm[ie] Blackm[a]n refused to talk to them. He was successful on some and not on others. [Senior counsel] also testified that he and the investigator canvassed the neighborhood door to door for witnesses but to no avail. However, he testified that his investigator had secured the entire police department file and copies of all of the witnesses' statements pre-trial. Further, they were able to convince the State to try [the petitioner] after defendants Garrin and Adams so that they would have the testimony of the witnesses as well. The Court feels the attorneys were not ineffective for failing to interview witnesses. It appears they were well prepared for trial. This issue has no[] merit.

Petitioner alleges that counsel failed to talk to codefendants, Garrin and Adams . . . . The testimony at the evidentiary hearing was that one co-defendant, name unknown, refused to talk to the investigator and another named the Petitioner as the "Trigger man". . . . There has been no proof presented that . . . [Garrin and/or Adams] wanted to testify [for the petitioner at trial] or that the[ir] testimony would have been helpful to the Petitioner and they were available to testify at this hearing. This Court therefore concludes that this issue is without merit.

Petitioner alleges ineffectiveness for not interviewing all of the co-defendants. The attorneys testified that they had each co-defendant's statement, as well as the statements of those present but not charged. . . . [C]ounsel had reviewed the testimony of those who had been tried and those who had testified in the earlier trials. Adams described the Petitioner as a shooter and described him as wearing a 3/4 length black coat. Shaw gave the same description, Buckner, who was arrested and charged as a participant by order of the court after his testimony, said the [petitioner] was present when the proceeds of the robbery were divided, Garrin said the petitioner fired shots and may have been the one to take the jewelry. This court has not seen any testimony or a statement from Richard Morris other than a small portion of his testimony placing the Petitioner on the scene with a gun. This Court has not heard testimony from any of these co-participants or co-defendants, which would have been beneficial to Petitioner or would have affected the verdict of the jury. This Court sees nothing beneficial that would have been offered by any of those present and nothing has been presented to the Court to indicate that due to the failure of defense counsel to interview these parties the outcome of the trial would have been different. This issue has no merit.

As found by the post-conviction court, the testimony showed that trial counsel and their investigator attempted to interview witnesses to the crimes. Tommie Blackman refused to talk to them. Counsel also had the entire file of the prosecution and had the transcripts of the trials of Carlito Adams and Derrick Garrin. One codefendant specifically identified the petitioner as the "trigger man." Both Carlito Adams and Kevin Shaw described the shooter as wearing a black trench coat. Buckner and Garrin both stated that the petitioner shared in the proceeds of the robbery, and Garrin stated that the petitioner fired shots. There is no proof that the petitioner provided trial counsel with the names of any of the numerous witnesses who could have testified that he had short hair. One witness identified the petitioner two days after the incident by photographic lineup in which the petitioner had a short hairstyle. Another witness described the petitioner as having a jheri curl. The petitioner refused to cooperate with counsel by changing his hairstyle or providing counsel with witnesses regarding his hairstyle or manner of dress. Further, he hampered any attempt to establish his lesser culpability by suddenly refusing to testify on his own behalf.

There was no proof presented that any of the participants other than the petitioner was wearing a trench coat during the shootings. The petitioner asserts that Kevin Shaw had a jheri curl at the time of the offenses. In support thereof, defense witness Rodney Weatherspoon identified Kevin Shaw as wearing longer hair with "the little curl." Notwithstanding, defense witness Kevin Whitaker testified that Kevin Shaw wore his hair in a "high-top fade." This conflicting evidence fails to identify Kevin Shaw as wearing a black trench coat or wearing a long jheri curl at the time of the offenses. The post-conviction court properly concluded that the petitioner failed to present evidence establishing that he was mistakenly identified as the shooter.

The conflicting testimony of the codefendants, the petitioner's refusal to cooperate with counsel, his statement to FBI agents, and his decision not to testify at trial hindered trial counsel's

efforts to pursue a theory of lesser culpability. Even if, as the petitioner claims, trial counsel were deficient in not presenting witnesses to testify regarding the length of his hairstyle, it is clear that the identification of him as the shooter does not rest solely upon his hairstyle. The proof, including the petitioner's statement to the FBI, established, beyond a reasonable doubt, that he was guilty of the felony murders of the victims, Johnson and Dawson. Thus, he has failed to show that he was prejudiced by counsel's alleged failure to further investigate his lesser culpability and the alleged failure to present evidence of his lesser culpability.

## 2. Penalty Phase

On appeal, the petitioner asserts that "[f]ailure to conduct even a rudimentary investigation in this case denied [the petitioner] his right to the effective assistance of counsel." According to the petitioner, "much of the problem in this case was related to the total lack of understanding of mitigation by defense counsel." To bolster this allegation, he points to his claims that "Obra Carter abused the women in his life and his children," and "Leslie Burns . . . had significant deficiencies as a parent." Pointing to the findings of Drs. Norton, Woods, Kertay, and Auble, we are directed to "various symptomologies" of the petitioner, including "traumatic stress, genetic vulnerabilities and environmental issues."

The post-conviction court found this claim to be without merit:

[O]n trial preparation, petitioner alleges failure to prepare proper mitigation. The defense strategy in this case was that the petitioner was a good person and this activity was out of character for him. . . . [T]rial counsel testified that a large part of their case was based upon the petitioner testifying. He had indicated throughout pretrial that he would testify. Yet at trial he decided not to. Although this is petitioner's right, it is also another example of his failure to cooperate with his attorneys by advising them of this decisions [sic] in advance. This court heard a full week's worth of testimony from mitigation witnesses; family, friends, teachers, a sociologist/mitigation expert and a neuro-psychiatrist. . . . [T]he proof presented showed that this was a well-adjusted young man who committed a crime that was out of character for him. After listening to all of the mitigation proof . . . this court heard nothing about the petitioner that offered any better insight into why this crime occurred or why the petitioner chose to act the way he did on the day in question. The bulk of the mitigation proof dealt with the petitioner's father. There was no proof offered . . . that his upbringing played any role in the commission of this offense. If anything it showed that the petitioner had overcome adversity and survived, leading to a conclusion that this crime was out of character. . . . [T]his Court does not feel that the petitioner has carried his burden of proof that the mitigation presented during this hearing would have changed the verdict rendered by the jury. . . .

Regarding the penalty phase, the proof established, under the testimony of Thomas and Jones, that the petitioner shot into a vehicle, creating a great risk of death. According to the petitioner's FBI

61

statement, he shot at Blackman, admitting that three children were in his line of fire. This statement also supports application of the factor of creating a great risk of death to two or more persons other than the victim. Under either theory, the aggravating circumstance is still established. The petitioner cannot establish that his sentence would have been different. The record supports the determination of the post-conviction court that this claim is without merit.

## B. Failure to Competently Select a Jury

The petitioner argues trial counsel did not adequately voir dire prospective jurors on their respective attitudes about the death penalty, alleging that counsel were completely inadequate with regard to the jury selection process in a capital case. In support of this allegation, he asserts that trial counsel failed to adequately voir dire potential jurors by not asking questions necessary to reveal their personal biases. Additionally, he faults them for failing, in his view, to zealously pursue the motion for individual voir dire. The petitioner asserts that, as evidenced by these alleged facts, "trial counsel surrendered in this case by not questioning jurors about their ability to consider a life sentence."

The post-conviction court found that trial counsel were not ineffective in selecting the jury:

Petitioner next complains about Errors at Trial. The first complaint deals with Voir Dire. The first three allegations deal with the extent or lack thereof, in which jurors were questioned about the death penalty, mitigation and the full range of punishment. The depth and complexity of voir dire is an individual decision made by each trial attorney. The purpose is to obtain a fair and impartial jury. Both trial counsels have long and distinguished trial records. They both have extensive experience in selecting juries and death qualified juries. Their testimony was that they were satisfied with the manner in which they selected the jury and they were satisfied that they had a fair jury. There has been no proof offered that this was not true. . . . Petitioner has failed to offer any proof that any particular juror was unfair or unqualified.

At the post-conviction hearing, trial counsel testified that Archibald had filed a motion, which was denied, for individual voir dire. Senior counsel acknowledged that "the standard policy . . . in Shelby County is that it's denied unless you begin to pick the jury and find that because of some pretrial publicity, individual voir dire may be warranted." As for the voir dire, counsel explained that he utilized standard questions for capital cases and said that a jury list was sought to get an idea of who the potential jurors were, where they worked, and their backgrounds. Junior counsel confirmed that a motion for individual voir dire was filed in hopes that "one day some judge will allow you to have individual voir dire . . . [ to prevent] the domino theory," but he had never had such a motion granted. He said that the potential jurors were asked questions to learn about their views of the death penalty and, while the law did not permit a person who was unable to impose the death penalty to be a juror, there was no way to gauge the strength of one's conviction to impose the death penalty. While he acknowledged that no questions were asked as to whether prospective jurors would

automatically impose the death penalty, he believed that such questions might inform the jury a defendant was guilty.

In the capital murder context, where the jury in the punishment phase must choose between life and death, several courts have said that not questioning as to whether a prospective juror can fairly consider a life sentence does not necessarily constitute deficient performance. Stanford v. Parker, 266 F.3d 442, 453-454 (6th Cir. 2001); Commonwealth v. Morris, 684 A.2d 1037, 1042-43 (Pa. 1996); Hartman v. State, 896 S.W.2d 94, 105 (Tenn. 1995). The Tennessee Supreme Court has held that the decision of whether to voir dire prospective jurors on their ability to consider a life sentence, or to what degree, is a strategic one. See Hartman, 896 S.W.2d at 105. Valid tactical reasons exist to refrain from asking detailed questions on the death penalty. Id. According to the Sixth Circuit, counsel may have validly refrained from asking such questions, not wanting prospective jurors to hear each other's answers. Stanford, 266 F.3d at 454. Junior counsel explained that, in his opinion, an inquiry in this regard may be perceived by potential jurors as a concession that credible evidence of guilt exists. Id.

The petitioner relies upon the holding in Morgan v. Illinois, 504 U.S. 719, 112 S. Ct. 2222 (1992), to support his claim that counsel's not asking life-qualifying questions prevented the proper exercise of challenges. Morgan holds that a defendant has the right to life-qualify the jury upon request but does not mandate that life-qualifying questions be asked of potential jurors in every case. By premising a defendant's right to life-qualify upon defense counsel's making a request to life-qualify, Morgan suggests that there are instances where defense counsel might choose not to ask life-qualifying questions as a matter of strategy.

The petitioner presents no evidence to counteract our conclusion that his counsel's failure to ask life-qualifying questions during general voir dire constituted trial strategy. Junior counsel explained his view that such questions risked suggesting to the jury that a defendant was guilty. The post-conviction court concluded that the decision not to ask "life-qualifying" questions of prospective jurors was a strategic determination by experienced counsel. The record supports this conclusion. Further, the petitioner has failed to establish that the trial outcome would have been different if these questions had been asked during voir dire.

The petitioner additionally argues that counsel should have pursued more zealously the motion for individual voir dire, including failing to pursue the issue on direct appeal. As our supreme court has noted, the prevailing practice is to examine jurors collectively. See State v. Austin, 87 S.W.3d 447, 471 (Tenn. 2002) (citing State v. Jefferson, 529 S.W.2d 674, 681 (Tenn. 1975)). Even in a capital case, there is no requirement that death qualification of a capital jury must be conducted by individual, sequestered voir dire. Id. Moreover, individual voir dire of prospective jurors is a matter within the trial court's discretion. Id. (citations omitted). "Individual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." Id. at 471-72. The record does not reflect that the petitioner's trial was a high profile case, and we conclude that he did not establish the need for individual voir dire.

The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994). The petitioner has not established that any juror was unqualified to serve, biased, or partial. In fact, junior counsel testified that his requests in previous cases for individual voir dire had been unsuccessful. The petitioner has failed to establish that trial counsel's request for individual voir dire would have been successful if pursued more zealously or that the outcome would have been different if the request had been granted. Accordingly, the record supports the determination of the post-conviction court that the petitioner did not establish that trial counsel were ineffective in selection of the jury.

## C. Failure to Object to Victim Impact Evidence

The petitioner argues that trial counsel were ineffective in failing to object to certain victim impact testimony. Again, he makes no references to having questioned trial counsel about this claim during the post-conviction hearing. The post-conviction court found this claim to be without merit:

> Petitioner alleges trial counsel should have objected to the victim impact testimony. No proof has been offered as to how said testimony was improper or how that testimony impacted the Jury Verdict. This Court has reviewed the testimony and finds that it was appropriate testimony and further finds that based upon all of the proof in the case the victim impact testimony in this Court's opinion played little role in the jury's verdict. . . .

During the guilt phase, the State presented the testimony of Jonnie Dawson, mother of victim Damond Dawson, who testified that he was the youngest of her three children and was seventeen years old at the time of his murder. Burns, 979 S.W.2d at 279. She described her son as "very good at athletics." Id. She said that "[t]he neighborhood had changed after the killings; people locked their doors and were afraid." Id. Brenda Hudson, the mother of victim Tracey Johnson, testified that he was twenty years old at the time of his murder and was the oldest of her three children. Id. She said Johnson had a four-month-old daughter who he supported and described the effect of his death on her two other children, his grandfather, and his daughter. Id.

On direct appeal, counsel challenged the admission of the testimony of both Jonnie Dawson and Brenda Hudson. Id. at 281. Our supreme court described the victim impact testimony:

> Here, the victims' mothers testified during the penalty phase. Each related a few details about their deceased sons. Ms. Dawson testified that the shootings had a negative effect on her own life: she had divorced, moved to another house, and no longer knew what it was like to feel happy. Johnson's mother, Ms. Hudson, testified that "it had been hard to let go" of the killings, and she cried every day. She also testified that the killing affected her other two children, her father, and the victim's young daughter.

Id. at 282.

In reviewing the admissibility of this evidence, the supreme court concluded that the trial court had not erred in allowing it:

> Although evidence regarding the emotional impact of the murder "should be most closely scrutinized," [State v.] Nesbit, 978 S.W.2d [872,] 891 [(Tenn. 1998)], nearly all of this evidence was limited in scope to a glimpse into the lives of Dawson and Johnson and the effects of the killings on their immediate families.  This testimony was reserved in nature and not inflammatory, and its admission was not barred by the capital sentencing statutes or the Constitutions of the United States and Tennessee.  Moreover, the prosecutor did not extensively discuss or emphasize this evidence in summation.  Accordingly, neither the admission of this evidence nor the prosecution's argument was improper.

Id.  The supreme court noted the additional testimony of Ms. Dawson as to the effects of the killings on the entire community, *e.g.*, people were afraid and kept their doors locked, id., noting that the prosecutor emphasized this claim during closing argument, *e.g.*, "They didn't just kill a couple of more Memphis teenagers . . . .  They killed an entire village.  They killed an entire neighborhood." Id. at 283.  The supreme court concluded that this testimony and the mention of it during closing argument went beyond being "'information designed to show those unique characteristics which provide a glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon *members of the victim's family*.'"  Id. (quoting Nesbit, 978 S.W.2d at 891).  However, the court further determined that the testimony and argument "did not render the proceedings fundamentally unfair or unduly prejudicial to the defendant."  Id. (citing Darden v. Wainwright, 477 U.S. 168, 106 S. Ct. 2464 (1986)).

The petitioner argues on appeal that trial counsel's not objecting to the admission of Ms. Dawson's testimony constituted ineffective assistance, denied him a fair trial, and resulted in the failure to preserve an important issue for appeal.  However, whether trial counsel were deficient in not objecting to the victim impact testimony of Jonnie Dawson and related argument of the prosecutor need not be decided since the petitioner is unable to show prejudice.  In this regard, on direct appeal, our supreme court determined that any error in admitting the statements and argument was harmless in view of the fact that neither the testimony nor the argument was inflammatory. Burns, 979 S.W.2d at 283.  The court further found that the admission of this victim impact testimony and argument did not render the proceedings fundamentally unfair or unduly prejudicial. Id.  In order for the petitioner to succeed on an ineffective assistance of counsel claim, there must be a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  This issue was resolved on direct appeal adversely to the petitioner.  Additionally, we note that an issue raised on direct appeal cannot form the basis of a claim of ineffective assistance of counsel on collateral review.  See Pruett v. Thompson, 996 F.2d 1560, 1576 (4th Cir. 1993).

**D. Trial Counsel's Pretrial Investigator and Presentation of Mitigation Evidence**
**and**
**E. Use of Expert Services**

The petitioner asserts that trial counsel "failed to present significant mitigation evidence." This mitigation proof included testimony that he was a decent person; that his father, Obra Carter, abused the women in his life and his children; and that his mother, Leslie Burns, had significant deficiencies as a parent due to the number of children in her household, the presence of a severely handicapped child, and the sum of problems she had leading to bouts with depression. He further argues that no evidence was presented regarding the nature of the neighborhood in which the petitioner was raised. In addition to lay testimony, he asserts, further, that trial counsel failed to adequately utilize the services of experts in investigating and presenting a mitigation defense, specifically, that not employing a mitigation specialist and a neuropsychologist resulted in counsel's performance falling below the expected standards for counsel in a capital proceeding.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545, 107 S. Ct. 837, 841 (1987); Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998). The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase, however, is constitutionally distinct from the question of whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative, however, that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. See Goad v. State, 938 S.W.2d 363, 369-70 (Tenn. 1996).

To ascertain whether trial counsel was ineffective by not presenting mitigating evidence, the reviewing court must consider several factors. First, the court must analyze the nature and extent of the mitigating evidence that was available but not presented. Goad, 938 S.W.2d at 371 (citing Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Adkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1994)). Second, the court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Id. (citing Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992); State v. Melson, 722 S.W.2d 417, 421 (Tenn. 1989)). Third, the court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. Id. (citing Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991)). Thus, to determine whether the petitioner has carried his burden of showing that there is a reasonable probability that at least one

juror would have declined to impose a sentence of death if presented with certain mitigation evidence, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542 (2003).

In support of his allegations, the petitioner points to the testimony of Dr. Norton, a mitigation specialist, and Dr. Woods, a neuropsychologist, arguing both concluded that Obra Carter was abusive to Zettie Thomas, Louise Carter, and Leslie Burns. Dr. Norton testified that the Burns family lived in a physically and emotionally abusive environment due to the conduct of Obra Carter, saying that the physical abuse of a child's mother can cause traumatic reactions in children. Dr. Woods believed that the petitioner had difficulty in certain coping skills, including the ability to weigh and deliberate, and related these problems to various symptomologies existing in his environment. He further found evidence of impaired judgment, saying the petitioner's inability to weigh and deliberate was a result of mental inflexibility which was indicated on the psychological testing. He found that these deficits played a part both in the poor decision-making of the petitioner at the time of the offenses as well as in his refusal to cut his hair prior to trial.

During the sentencing portion of the petitioner's trial, counsel presented the testimony of six witnesses. See Burns, 979 S.W.2d at 279. Leslie Burns, the petitioner's mother, testified that he was twenty-six years of age, had twelve brothers and sisters, had graduated from high school, and had presented no disciplinary problems while in school. Id. His father, Obra Carter, testified that his son had always been obedient and well-mannered. Id. Phillip Carter, the petitioner's half-brother, testified that the petitioner had been active in church and had always tried to avoid trouble. Id. Norman McDonald, the petitioner's Sunday School teacher, testified that the petitioner was a "faithful" young man who attended church regularly. Id. Mary Wilson, a captain with the Shelby County Sheriff's Department, and Bennett Dean, a volunteer chaplain, both testified that the petitioner had actively participated in religious services while in custody for these offenses. Id. The petitioner complains that this evidence "failed to say much, if anything, about Kevin Burns."

At the post-conviction hearing, senior counsel testified that he instructed the investigator to contact approximately twelve friends, neighbors, teachers, and co-workers of the petitioner. An attempt was made to interview the petitioner's siblings. The witnesses that counsel selected to testify were those who could relate the most positive things about the petitioner. A limit was placed on the number of witnesses, however, to prevent cross-examination as to the petitioner's prior criminal record. Senior counsel said that the petitioner's mother had instructed certain witnesses not to come to trial. He acknowledged that no investigation was made into the culture of West Memphis or the nature of the petitioner's neighborhood and said he had not been told of instances where gunshots had been fired at the petitioner's house. Senior counsel explained that neither of the petitioner's parents provided any indication that the petitioner had anything but a normal childhood. Counsel also could not see any mitigation value in testimony that the petitioner's house was located near a housing project.

Regarding the use of mental health experts, senior counsel said there was no indication from either the mental evaluation performed by Midtown Mental Health, the petitioner's family, or his

school records that the petitioner had any mental problem or mental illness. Counsel said that, had anything been discovered that would have questioned the petitioner's mental condition, counsel would have sought additional assistance from the court. In counsel's opinion, the petitioner understood the nature and consequences of his defense but refused to follow counsel's recommendations.

Senior counsel said that he understood the presentation of mitigation evidence as "those factors that are enumerated in the statute in terms of presenting them and the defendant's case whether it be his age, his – any kind of mental problems, his role as a leader, or amount of participation in the crime involved, and thus his family history, society history." He said he had never used the services of a mitigation specialist.

Junior counsel described the penalty phase defense, that the petitioner "was in fact a good person," as "[v]ery weak." He reiterated senior counsel's testimony that certain mitigation witnesses were not used because their testimony was cumulative and counsel did not want to open the door as to questioning about the petitioner's prior criminal record. He said their proof was intended to show that the petitioner did not have a bad childhood and there was no reason for him to be involved in the crimes. Counsel said that, in preparing for mitigation, counsel were hindered by the actions of the petitioner's mother who prevented certain evidence from being introduced, recounting that she "basically controlled this case as far as whether or not people would talk to us, and during the negotiations and talking to her and talking to his dad at one point it got to the point that she didn't want anybody, any family members or anybody from West Memphis to [have] anything to do with us at all period." Her actions blocked trial counsel from presenting witnesses from the petitioner's community. Other potential witnesses refused to testify because they did not want to be bothered or did not remember the petitioner as well as he thought they did, and junior counsel opined that it was a bad practice to compel mitigation witnesses to testify.

Junior counsel acknowledged that he and senior counsel did not investigate the culture of West Memphis, Arkansas. He said that, in his opinion, the culture of West Memphis was not that different from that of Memphis and, while there were minor differences, he did not believe that these rose to the level of mitigation. As to testimony about the petitioner's family, counsel stated that he was aware the petitioner's father was relatively strict but knew that the father had a separate family with whom he resided. Counsel observed that this situation was peculiar but not sufficient to rise to the level of mitigation. Additionally, he explained that the petitioner was more influenced by his mother than his father and that the petitioner's neighborhood was not particularly violent. While he acknowledged that information that gunshots had been fired at the petitioner's house might have been useful in mitigation, no such information was ever passed along to counsel.

Junior counsel said that their preparation of a defense theory at both the guilt and penalty phases was hindered by the lack of cooperation by the petitioner's family. For example, the petitioner's mother refused to believe that her son had committed any crime. Counsel related that he and co-counsel had learned through their investigation that the petitioner's mother had actually

"assisted him in that little trip to Chicago evading arrest." Counsel included the petitioner in creating a mitigation strategy and providing them with the names of witnesses.

Corroborating senior counsel's statements, junior counsel testified that there was no indication whatsoever that the petitioner suffered from any mental or personality defects. All information was consistent in that it revealed that the petitioner had a decent childhood, knew both of his parents, attended school, and had food and clothing.

The post-conviction court found that the defense strategy was, in fact, that the petitioner was a good person and that the criminal acts were out of character for him:

> Finally, on trial preparation, petitioner alleges failure to prepare proper mitigation. The defense strategy in this case was that the petitioner was a good person and this activity was out of character for him. Further, trial counsel testified that a large part of their case was based upon the petitioner testifying. He had indicated throughout pretrial that he would testify. Yet at trial he decided not to. Although this is petitioner's right, it is also another example of his failure to cooperate with his attorneys by advising them of this decision[] in advance. This court heard a full week's worth of testimony from mitigation witnesses; family, friends, teachers, a sociologist/mitigation expert and a neuro-psychiatrist. In this court's opinion the proof presented showed that this was a well-adjusted young man who committed a crime that was out of character for him. After listening to all of the mitigation proof presented this court heard nothing about the petitioner that offered any better insight into why this crime occurred or why the petitioner chose to act the way he did on the day in question. The bulk of the mitigation proof dealt with the petitioner's father. There was no proof offered, including testimony from the petitioner, that his upbringing played any role in the commission of this offense. If anything it showed that the petitioner had overcome adversity and survived, leading to a conclusion that this crime was out of character. Based upon the proof presented, this Court does not feel that the petitioner has carried his burden of proof that the mitigation presented during this hearing would have changed the verdict rendered by the jury. Therefore, the Court finds this issue has no merit.

This proof supported the conclusion that the petitioner was a well-adjusted young man who committed a crime that was out of character for him. The post-conviction court concluded that the petitioner failed to offer any better insight at the evidentiary hearing into why this crime occurred or why the petitioner chose to act the way he did on the day of the double homicide.

"While '[i]t should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness' it is unclear how detailed an investigation is necessary" under Strickland to ensure effective counsel. White v. Singletary, 972 F.2d 1218, 1224 (11th Cir. 1992) (internal citation omitted). The right to present and have a

sentencer consider any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence or fails to present a case in mitigation at the capital sentencing hearing. Thus, although "no absolute duty exists to investigate particular facts or a certain line of defense," see Chandler v. United States, 218 F.3d 1305, 1317 (11th Cir. 2000), counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S. Ct. 2052. In determining whether counsel breached this duty, "we must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." Wiggins, 539 U.S. at 523, 123 S. Ct. at 2536 (internal citation and quotation marks omitted). It is also necessary to be mindful that defense counsel is not required to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing" or "to present mitigating evidence at sentencing in every case." Id. at 533, 123 S. Ct. at 2540. Moreover, counsel does not have the duty to interview every conceivable witness. Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). In sum, counsel's investigation will not be found deficient for failing to unveil all mitigating evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. See Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998).

The petitioner presented witnesses at the post-conviction evidentiary hearing who arguably could have provided mitigation evidence had they been called to testify. However, the fact that additional witnesses such as these might have been available or that other testimony might have been elicited from those who testified does not establish ineffective assistance of counsel. Waters v. Thomas, 46 F.3d 1506, 1513-14 (11th Cir. 1995).

The post-conviction court found that the mitigation evidence presented by trial counsel "showed that this was a well-adjusted young man who committed a crime that was out of character for him." Additionally, the court concluded that "[t]he bulk of the mitigation proof dealt with the petitioner's father" but "offered [no] better insight into why this crime occurred or why the petitioner chose to act the way he did on the day in question." Thus, the post-conviction court found that, although the petitioner established that additional witnesses were available, the "bulk" of them testified about his father and did not offer any explanation as to why he had committed the crimes. Thus, the court concluded that the petitioner failed to show that he was prejudiced by the fact these witnesses had not testified at the trial. The record supports these conclusions.

Additionally, the petitioner argues that trial counsel were ineffective in not retaining the services of a mitigation specialist and/or a mental health expert. As to this claim, we note there is no *per se* rule requiring defense counsel to retain experts in every capital case. While the United States Supreme Court has adopted standards such as those set forth by the American Bar Association as guidelines for what is reasonable, the Court repeatedly has declined to adopt a rigid checklist of tasks that defense counsel must perform in all cases because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."

70

Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065. This fact, coupled with the "constitutionally protected independence of counsel," has resulted in trial counsel being granted broad discretion as to whether the retention of an expert will serve the interests of their clients. See Wiggins, 539 U.S. at 533, 123 S. Ct. at 2541; see also Kandies v. Polk, 385 F.3d 457, 470 (4th Cir. 2004).

As for counsel's not retaining a mitigating specialist, it is clear that such a witness is not exclusive means through which defense counsel can thoroughly investigate a defendant's background. See Kandies, 385 F.3d at 470. Defense counsel has numerous tools available by which to conduct a background investigation, including lay persons such as family, friends, and coworkers, the defendant, and defense counsel's own experience. Id. In the present case, counsel conducted an investigation and developed a mitigation theory to which they adhered. The testimony of the witnesses at the sentencing hearing supported counsel's investigation and development of this theory. Although additional information regarding the petitioner's family history was presented at the post-conviction hearing, much of that evidence dealt with the life experiences of Leslie Burns and Obra Carter but did not show how they affected the petitioner. We disagree with the argument that trial counsel's duty to investigate was not "governed" by the petitioner's own cooperation or lack thereof. The United States Supreme Court has unequivocally stated that "what investigation decisions are reasonable depends critically" on "information supplied by the defendant." Strickland, 466 U.S. at 691, 104 S. Ct. 2066; cf. Barnes v. Thompson, 58 F.3d 971, 979-80 (4th Cir. 1995) (stating that counsel "may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation"). Thus, counsel cannot be faulted for relying upon the assertions of the petitioner and/or his family members.

In sum, we note that this is not a case in which counsel failed to conduct any inquiry into the accused's background and social history. See Williams v. Taylor, 529 U.S. 362, 396, 120 S. Ct. 1495, 1514 (2000). Rather, based on their investigation, trial counsel determined that the best mitigation defense was to show that the petitioner was "a good guy" and that this crime was out of character for him, this theory based upon the information provided by the petitioner and his family. There was no indication, by either the petitioner or his parents, that further investigation into the family history was necessary or would have been fruitful. Although much information specific to the petitioner's mother and father and not directly related to him was presented at the post-conviction hearing, that proof shadowed the mitigation theme of the defense at trial, *i.e.*, that the petitioner was "a good guy." Regardless what a different investigation might have uncovered, the petitioner must first demonstrate that counsel's deciding not to investigate further was objectively unreasonable performance. Cauthern v. State, 145 S.W.3d 571, 604 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2004). The petitioner has failed to do so. Counsel's decision not to further investigate into the petitioner's background by hiring a mitigation specialist was reasonable based upon the information they had.

The petitioner also criticizes trial counsel's decision not to retain a mental health expert. As before, we must determine whether counsel's decision in this regard constituted ineffective assistance. The evidence at the post-conviction hearing revealed that trial counsel, upon their initial appointment in this matter, filed motions requesting the assistance of several experts, including a

psychologist. The petitioner's first senior counsel appointed explained that the motions were filed in anticipation of presenting proof at the penalty phase, saying that he interviewed the petitioner regarding his medical history, school activities, drug or alcohol use, and prior criminal history. The petitioner never spoke of a drug or alcohol problem. The first junior counsel appointed testified that a mental evaluation of the petitioner was requested out of an abundance of caution, and the evaluation concluded that he was competent and that an insanity plea could not be supported. This information was provided to successor counsel who actually represented the petitioner at trial. After reviewing the petitioner's background, childhood problems, and school and family history, senior counsel concluded that nothing indicated that a further check into the petitioner's mental status was necessary and nothing caused them to believe that the petitioner did not understand the various plea offers. Senior counsel said that had anything been discovered to question the petitioner's mental condition, counsel would have made further inquiry. Junior counsel confirmed that there was no indication that the petitioner suffered from any mental or personality defects.

Trial counsel's being unfamiliar with much of the information presented at the evidentiary hearing as to the petitioner's alleged family history of mental illness and the petitioner's "impaired judgment" was not unreasonable. Counsel and their investigator spoke with the petitioner, his family members, and others who might have had such information, and none of them suggested there was any history of mental illness in the petitioner's family or that he suffered from any mental defect. Other courts have held that "counsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." Matthews v. Evatt, 105 F.3d 907, 920 (4th Cir. 1997). This comports with the principle that a lawyer may make reasonable decisions that render particular investigations unnecessary. The absence of any information from the petitioner, his family members, or others indicating any mental defect/illness in conjunction with a mental evaluation of the petitioner which did not provide any indication of a potential mental illness supports counsel's decision that further investigation with a mental health expert was not necessary. See Babbitt, 151 F.3d at 1174.

A review of the record indicates that trial counsel's decisions not to employ either a mitigation specialist or a mental health expert were reasonable considering the information amassed by counsel through their investigation. Accordingly, counsel were not deficient in their investigation in this matter. Moreover, the proof at trial was overwhelming with regard to the aggravating circumstance. In the direct appeal of this matter, our supreme court concluded that "the evidence . . . overwhelmingly supports the prosecutor's argument and the jury's finding that the [petitioner] knowingly created a great risk of death to two or more persons other than the victims murdered." See Burns, 979 S.W.2d at 281. "The [petitioner] fired his weapon inside the car where Dawson, Johnson, and Thomas were seated, killing Dawson and wounding Thomas. He admitted firing shots at the fleeing Blackman, which . . . directly imperiled Eric Jones and the three individuals who were playing basketball in the Dawson's driveway." Id. The post-conviction court properly found that the potential mitigation evidence disclosed at the post-conviction hearing was cumulative and corroborative of the mitigation evidence presented at the penalty phase. While information was revealed relating to the life of the petitioner's mother, the disciplinary tactics of the petitioner's father, and the petitioner's alleged "impaired judgment," we cannot conclude that this evidence would have persuaded the jury not to impose the death penalty. The petitioner is not entitled to relief

on this issue.

## F. Failure to Prepare Defense Witnesses

The petitioner argues that trial counsel failed to prepare defense witnesses to testify. In support of this allegation, he relies upon the testimony of Leslie Burns and Phillip Carter. Leslie Burns, the petitioner's mother, related that she first learned that she was to testify at the penalty phase on the day that she was called to testify, saying that trial counsel never explained the goal of her testimony or what she was expected to say. Phillip Carter, the petitioner's half-brother, testified that he only spoke with the petitioner's attorneys for about five to seven minutes prior to his taking the stand. He said that he was not advised as to the nature or scope of his testimony, nor was he questioned regarding his relationship with the petitioner. The petitioner contends that, had trial counsel prepared these witnesses to testify, counsel's examination would have been more far reaching. This failure, he contends, constituted ineffective assistance of counsel.

During the penalty phase of the trial, Leslie Burns testified that the petitioner was twenty-six years old and had twelve brothers and sisters. Burns, 979 S.W.2d at 279. She said that the petitioner had graduated from high school and had presented no disciplinary problems while in school. Id. Phillip Carter testified that the petitioner was active in his church and always tried to avoid trouble. Id.

At the post-conviction evidentiary hearing, Leslie Burns testified extensively as to the circumstances of her own life, describing the living conditions for herself and her children, as well as the amount of contact Obra Carter had with his children. She reaffirmed her testimony at the penalty phase by agreeing that the petitioner was "a good son, never caused any trouble," and said that he had graduated from high school. Phillip Carter recalled that his testimony at the penalty phase was limited to what schools he attended and what kind of person the petitioner was. He said the petitioner had a good work ethic and recounted the petitioner's career with Shoney's restaurant. He also provided testimony regarding his first meeting with the Burns children and the "house rules" established and enforced by Obra Carter. Throughout his testimony, Phillip Carter reaffirmed the principle that the petitioner was never in trouble and that he and the petitioner were raised to know the difference between right and wrong.

Senior counsel explained that mitigation witnesses were limited in order to prevent cross-examination by the State into the petitioner's prior criminal record. He stated that the witnesses were chosen based upon who could say the most positive things about the petitioner. He further stated that the petitioner's parents provided no indication that the petitioner had anything but a normal childhood. He explained that all of their evidence established that the petitioner "was in fact a good person." In this regard, their presentation of witnesses was limited because the testimony would have been cumulative. Junior counsel explained that the plan was to present "good guy mitigation" evidence and to paint a picture that the petitioner did not deserve a sentence of death.

The post-conviction court correctly concluded that the proof presented at the evidentiary hearing showed that the petitioner was a well-adjusted young man who committed a crime that was

73

out of character for him. In other words, the proof at the post-conviction hearing was consistent with what Leslie Burns and Phillip Carter testified to during the penalty phase. The strategy of the defense was to present testimony that the petitioner was a "good guy," and this is exactly the type of testimony that was provided by the mitigation witnesses. The petitioner has failed to offer any proof establishing how additional preparation of these witnesses by trial counsel would have altered the result of the penalty phase. In this regard, the petitioner has failed to carry his burden.

## VI. Constitutional Errors with the Imposition of the Death Penalty

The petitioner raised numerous challenges to the constitutionality of the imposition of the death penalty. In essence, he asserts that his sentence of death must be vacated because the trial and appellate proceedings were rife with constitutional error. We agree with the State that these claims should have been raised in prior proceedings. Accordingly, the petitioner's claims are waived. See Tenn. Code Ann. § 40-30-106(g). Notwithstanding, inasmuch as the petitioner related these claims to his allegation of ineffective counsel, we proceed to address each claim on its merits.

### A. Death Sentence Infringes upon the Petitioner's Fundamental Right to Life

The petitioner contends that his sentence of death should be set aside because it infringes upon his fundamental right to life. In support of this position, he asserts that the punishment of death is not necessary to promote any compelling state interest in punishing him and that the State has not shown there are no less restrictive means of punishing him. The petitioner's complaint that his death sentence must be reversed because it violates his "fundamental right to life" is contrary to settled precedent as reflected in Cauthern, 145 S.W.3d at 629 (citing Nichols, 90 S.W.3d at 604; State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997) (Appendix); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997)). Accordingly, this argument is without merit.

### B. Failure to Charge Aggravating Circumstance in Indictment Violates Due Process

The petitioner next asserts that his being sentenced to death violates the Due Process Clause, Article I, § 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. Relying upon Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), he argues that his indictment was flawed because the aggravating circumstances which made him eligible for the death penalty were not submitted to the grand jury nor returned in the indictment.

The petitioner's argument is based upon the premise that first degree murder is not a capital offense unless accompanied by aggravating factors. Thus, he alleges that to satisfy the requirements of Apprendi, the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder. This argument has recently been rejected by our supreme court in State v. Holton, 126 S.W.3d 845 (Tenn. 2004); see also State v. Berry, 141 S.W.3d 549, 558-562 (Tenn. 2004) (concluding also that the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), does not alter the court's analysis on whether statutory aggravating circumstances must be pled in the indictment). The petitioner is not entitled to relief on this issue.

74

## C. Death Penalty Violates <u>Bush v. Gore</u>

The petitioner contends that the imposition of the death penalty violates both the state and federal constitutions because the statute grants absolute discretion to each individual district attorney general to indiscriminately seek the death penalty. The petitioner concedes that this issue was raised and rejected on direct appeal as part of a general challenge to the Tennessee death penalty statute. See <u>Burns</u>, 979 S.W.2d at 297. Our supreme court has not altered its opinion and has continued to reject this claim since the petitioner's direct appeal. <u>See, e.g.</u>, <u>State v. Thomas</u>, 158 S.W.3d 361, 407 (Tenn. 2005). Notwithstanding, the petitioner asserts that the issue should be reconsidered in light of the principles set forth in <u>Bush v. Gore</u>, 531 U.S. 98, 121 S. Ct. 525 (2000). The petitioner asserts that the prosecutorial function is analogous to a state court's issuance of a remedy and implies a duty to ensure that prosecution of crimes is implemented fairly.

The petitioner's claim fails for numerous reasons. First, the opinion in <u>Bush</u> was not released until 2000, two years after our supreme court's affirmance of the petitioner's convictions and death sentence. Thus, <u>Bush</u> is inapplicable to the petitioner's case unless the holding established a new rule of law which is to be applied retroactively.

In <u>Bush</u>, the United States Supreme Court held that when a state court orders a remedy, such as a recount of votes, there must be some assurance the implementation of the remedy will comport with "the rudimentary requirements of equal treatment and fundamental fairness. . . ." <u>Id.</u> at 109, 121 S. Ct. at 532. The potential sweep of the Supreme Court's holding is limited by the opinion's own words: "Our consideration is limited to the present circumstances. . . ." <u>Id.</u> Thus, we decline the invitation to conclude that <u>Bush</u> established a new rule of constitutional criminal procedure. <u>Bush</u>, a voting rights case, does not apply to this criminal prosecution. <u>See generally</u> <u>Black v. Bell</u>, 181 F. Supp. 2d 832, 879 (M.D. Tenn. 2001). Moreover, the petitioner's claim, on its merits, has been rejected on numerous occasions. The United States Supreme Court has refused to strike down various death penalty statutes on the ground that those statutes grant prosecutors discretion in determining whether to the seek the death penalty. <u>Gregg v. Georgia</u>, 428 U.S. 153, 199, 96 S. Ct. 2909, 2937 (1976) (The petitioner's argument "that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense" does not indicate that system is unconstitutional.); <u>Proffitt v. Florida</u>, 428 U.S. 242, 96 S. Ct. 2960, 2967 (1976) (same). Applying the United States Supreme Court decision in <u>Gregg</u>, 428 U.S. at 198-99, 96 S. Ct. at 2937, the Tennessee Supreme Court has held that:

> opportunities for discretionary action occurring during the processing of a murder case, including the authority of the state prosecutor to select those persons for whom he wishes to seek capital punishment do not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty arbitrary or freakish.

<u>State v. Cazes</u>, 875 S.W.2d 253, 268 (Tenn. 1994); <u>see also</u> <u>State v. Brimmer</u>, 876 S.W.2d 75, 86 (Tenn. 1994); <u>State v. Hall</u>, 958 S.W.2d 679, 716 (Tenn. 1997). Moreover, in <u>Hall</u>, our supreme court expressly rejected the assertion that prosecutorial discretion to seek the death penalty violated

the separation of powers doctrine found in Article II, § 2 of the Tennessee Constitution. 958 S.W.2d at 716-17. Accordingly, we conclude that the decision in Bush, a case involving the method of counting ballots for a presidential election, does not invalidate the discretion of the prosecutor in determining whether to seek the death penalty. This claim is without merit.

### D. Execution by Lethal Injection is Cruel and Unusual Punishment

The petitioner next submits that "the process of lethal injection . . . violates his state and federal constitutional rights against cruel and unusual punishment." Our supreme court recently concluded that death by lethal injection is not constitutionally prohibited. See State v. Robinson, 146 S.W.3d 469 (Tenn. 2004), pet. for cert. filed (Jan. 31, 2005).

### E. Sentence of Death Violates International Law

The petitioner asserts that Tennessee's imposition of the death penalty violates United States treaties as well as the Supremacy Clause of the United States Constitution. It appears that he argues that the Supremacy Clause was violated when his rights under treaties and customary international law to which the United States is bound were disregarded. Arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by the courts. See State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004). This claim is without merit.

### CONCLUSION

After a thorough review of the record and the law applicable to the issues raised herein, we conclude that the petitioner has failed to prove the allegations contained in his post-conviction petition. The order of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE